2021 IL App (1st) 200851

FIFTH DIVISION
DECEMBER 23, 2021

No. 1-20-0851

| | | |
|---|---|---|
| LISA PASQUINELLI and BRIAN KEAN, as Independent Coexecutors of the Estate of Joan Kean, Deceased, and as Special Administrators of the Estate of Thomas Kean, Deceased, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 18 L 010395 |
| SODEXO, INC.; CK FRANCHISING, INC. d/b/a Comfort Keepers; and HELPSOURCE OF NORTH SHORE, INC. d/b/a Comfort Keepers, | ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | John H. Ehrlich, Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1     The plaintiffs-appellants, Lisa Pasquinelli and Brian Kean, are the independent coexecutors of the estate of Joan Kean, deceased, and the special administrators of the estate of Thomas Kean, deceased (Estates). The Estates brought a wrongful death and survival action in the circuit court of Cook County, against the defendants-appellees, Sodexo, Inc., CK Franchising, Inc., and Helpsource of North Shore, Inc., both doing business as Comfort Keepers (Comfort Keepers). The circuit court granted summary judgment in favor of Comfort Keepers, and the Estates now appeal. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3 This matter arises out of an incident that occurred on November 3 and 4, 2016, which resulted in the deaths of Thomas and Joan Kean, an elderly married couple. In March 2015, the Keans hired Comfort Keepers to provide caretaking services to Mrs. Kean, who was suffering from dementia. The Keans entered into a client care agreement with Comfort Keepers, which stated that the plan of care for Mrs. Kean would include homemaking duties such as cleaning, assisting with meal preparation, and reminding her to take her medications, as well as personal care duties such as dressing and bathing Mrs. Kean. The client care agreement further provided, in relevant part:

"¶ 5: The Client acknowledges that Comfort Keepers employees *who are not providing nursing services under the Plan of Care are not qualified or authorized to provide any medical services to the Client*. The Client further acknowledges that if a medical emergency arises while any Comfort Keepers employee is providing services to the Client or is otherwise present, *that employee will not provide any medical services to the Client, but the employee may call 911 for emergency assistance*. The Client agrees to hold harmless Comfort Keepers and its employee for any medical or other care that the employee may provide to the Client from instructions given by any 911 service provider.

¶ 6: The Client agrees not to hold Comfort keepers or its employees responsible for any physical loss or damage to, or loss of use of the Client's property while outside the care or control of a Comfort Keepers employee. The Client will not hold Comfort Keepers or its employees responsible for any bodily injury to the Client if the Client fails to follow the employee's instructions and/or injury occurs while the Client is not in the presence of the employee. *The Client further agrees not to hold Comfort Keepers or its employees responsible for any bodily injury, property damage, fire, theft, collision or public liability claims arising out of the operation of a motor vehicle that is not owned or controlled by a*

*Comfort Keepers employee.*" (Emphases added.)

Imelda Reyes, a Comfort Keepers employee, was assigned as Mrs. Kean's live-in caregiver.

¶ 4    On November 2, 2016, the Keans contracted with Comfort Keepers to have Ms. Reyes also provide caregiving services to Mr. Kean, who was alert mentally but had respiratory issues and used an oxygen tank to breathe.

¶ 5    On November 3, 2016,[1] at approximately 4 p.m., the Keans and Ms. Reyes returned home from running errands. Mr. Kean was driving his car, and Mrs. Kean and Ms. Reyes were riding as passengers. They pulled into the garage attached to the Keans' single-family home, and Mr. Kean parked the car but did not turn it off. Ms. Reyes exited the car first and then assisted Mrs. Kean out of the car and into her wheelchair. Ms. Reyes and Mrs. Kean entered the house, leaving Mr. Kean in the still-running car.

¶ 6    Once Ms. Reyes got Mrs. Kean settled inside the house, she began preparing dinner. About 15 minutes later, Mr. Kean entered the house from the attached garage. According to Ms. Reyes, at some point later in the evening she "smelled something" in the stairwell and asked Mr. Kean about it. Mr. Kean responded that he did not know what the smell was but suggested that it was maybe something from outside. Ms. Reyes said that she checked the bedrooms to see if she could find the source of the smell but was unsuccessful. All three of them became unusually tired around 10 p.m. Ms. Reyes assisted Mrs. Kean into bed and then went to her own bedroom. She did not smell the odor in her bedroom but noticed that it felt "hotter than normal." She usually talked to her young son on the phone before going to bed, but she was too tired to talk on the phone that night and just went to sleep.

---

[1]We note that the parties sometimes state that the incident occurred in the afternoon of November 4, 2016. However, the record reflects that the incident began in the afternoon of November 3, 2016, and continued into the early morning hours of November 4, 2016.

¶ 7    At approximately 3 a.m., Ms. Reyes was awakened by the sound of Mr. Kean calling for her and yelling that he could not breathe. She got out of bed and ran to Mr. Kean, who was sitting in the bathroom struggling to breathe. Ms. Reyes was also having a hard time breathing and called 911. She told the 911 operator that something was wrong with the house that was making it hard to breathe. The 911 operator told Ms. Reyes to get out of the house, but Ms. Reyes responded, "I cannot get out of this house. I have my two old people with me, I can't [leave them]." Ms. Reyes waited inside the house with the Keans for emergency services to arrive.

¶ 8    Emergency medical services, the Park Ridge Fire Department, and the Park Ridge Police Department were dispatched to the Keans' house. As the fire department entered the house with their carbon monoxide equipment, the "four-gas meter" began alarming. The meter registered over 900 parts per million of carbon monoxide inside the house, a level that was "immediately dangerous to life and health."

¶ 9    The Keans and Ms. Reyes were all removed from the house and transported to the hospital. After emergency services removed the Keans and Ms. Reyes from the house, they searched the house and discovered that Mr. Kean's car was running inside the attached garage, which was the source of the carbon monoxide. They also discovered that there were no carbon monoxide detectors anywhere in the Keans' home.

¶ 10    Mr. Kean was pronounced dead at the hospital at approximately 4:18 a.m. on November 4, 2016. The Cook County Medical Examiner's report listed Mr. Kean's cause of death as carbon monoxide intoxication, vitiated atmosphere, and residential infusion from motor vehicle exhaust. Mrs. Kean was treated for carbon monoxide poisoning and was then transported to a long-term care facility. She passed away on November 17, 2016. The Medical Examiner's report listed her cause of death as Alzheimer's/dementia. Ms. Reyes was also treated for carbon monoxide

poisoning and recovered.

¶ 11    On February 8, 2018, the Estates filed a wrongful death and survival action against Comfort Keepers. The complaint alleged that Comfort Keepers, through Ms. Reyes, "knew or should have known that [Mr. and Mrs. Kean] required supervision and assistance with activities of daily living, including but not limited to parking the car and ensuring the car was properly turned off after use *** " and "knew or should have known that [Mr. and Mrs. Kean] needed assistance in daily living by, but not limited to, making sure their home environment was free from safety hazards." According to the Estates, Comfort Keepers had a duty of reasonable care in providing services to the Keans, and Comfort Keepers was negligent in its care by failing to properly protect the Keans or provide them a safe environment—specifically, when Ms. Reyes did not ensure that the car was turned off and did not investigate the source of the odor she smelled. The complaint alleged that Comfort Keepers' negligent acts proximately caused the death of the Keans.

¶ 12    Comfort Keepers answered the Estates' complaint by denying all material allegations. On October 18, 2018, Comfort Keepers filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018)). The motion to dismiss argued that Comfort Keepers did not owe a duty to ensure that the Keans' home was compliant with the Carbon Monoxide Alarm Detector Act (430 ILCS 135/1 (West 2018)) or to turn off Mr. Kean's car. The motion to dismiss additionally argued that the client care agreement precluded liability, as it explicitly listed Ms. Reyes' duty as caretaking functions that were not related to medical or emergency tasks. Comfort Keepers also pointed out that the client care agreement provided: "The Client further agrees not to hold Comfort Keepers or its employees responsible for any bodily injury, property damage, fire, theft, collision or public liability claims *arising out of the operation of a motor vehicle* that is not owned or controlled by a Comfort Keepers employee." Accordingly,

Comfort Keepers claimed that, because the incident arose out of Mr. Kean operating his car, Comfort Keepers could not be held liable.[2]

¶ 13    On February 14, 2020, the Estates filed a response to Comfort Keepers' motion to dismiss. The response argued that Comfort Keepers did owe a duty of care to the Keans because it had a "specialized knowledge in caring for elderly clients," which included "looking out for potential safety hazards." The Estates claimed that Comfort Keepers tested their caregivers, including Ms. Reyes, about safety precautions and required them to maintain written emergency preparedness plans for its clients, which showed that Comfort Keepers had a duty to ensure that its clients' homes were safe. The Estates additionally claimed that the fact that the Keans did not have a carbon monoxide detector in the home did not discharge Comfort Keepers from its duty to act as a reasonably prudent caregiver, especially since Ms. Reyes had noticed an odd odor but did not investigate it.

¶ 14    In the response, the Estates also stated:

> "Originally, Ms. Reyes only provided services to [Mrs.] Kean. Before the accident, however, Comfort Keepers was hired to provide services to [Mr.] Kean as well. When Comfort Keepers began providing services to [Mr.] Kean, Ms. Reyes' supervisor suggested that the Keans have two caregivers so that Ms. Reyes was able to focus on [Mrs.] Kean's needs. *** Despite this extra work, however, Comfort Keepers did not assign a second caregiver to help Ms. Reyes with her work for the Keans and allowed Ms. Reyes to be the sole caregiver for both Keans. ***

---

[2]The motion to dismiss also noted that, even though the Estates' complaint alleged Mrs. Kean died from carbon monoxide poisoning, the Medical Examiner's report stated that her cause of death was Alzheimer's/dementia. In their response, the Estates argued that the proximate cause of Mrs. Kean's death was a question of material fact to be determined at trial.

A second caregiver was not assigned to the Keans because [Mr.] Kean did not think another caregiver was necessary. *** Regardless of this, though, Comfort Keepers had specialized knowledge in the area of caregiving and knew that another caregiver should have been assigned to the Keans. *** A reasonably prudent caregiving corporation would have either required a second caregiver in the Kean home or terminated their contract so that the Keans could find another provider. *** Ms. Reyes admitted that she did not know whether [Mr.] Kean turned off the car because she had to focus all her attention on [Mrs.] Kean. *** A second caregiver assigned to [Mr.] Kean would have been able to pay individualized attention to him and ensure that he did not leave the car running in the garage."

The Estates' response to the motion to dismiss concluded by arguing that the client care agreement's provision about the operation of a vehicle did not preclude recovery because "[n]obody was operating the vehicle while it pumped carbon monoxide into the Keans' home."

¶ 15    Comfort Keepers filed a reply in support of its motion to dismiss. After some continuances due, in part, to the COVID-19 pandemic, the trial court entered an order in favor of Comfort Keepers on July 9, 2020.

¶ 16    The trial court's order noted that there were procedural and substantive issues with Comfort Keepers' motion to dismiss. The procedural issue was that the motion was untimely, considering that Comfort Keepers had previously answered the complaint. As for the substantive issue, "[Comfort Keepers'] motion is not a motion to dismiss." The trial court explained that Comfort Keepers argued in its motion that it "owed the Keans no duties either to care or to rescue based on the client care agreements." The court's order continued:

"Those arguments do not assert affirmative matter negating the [Estates']

claims, but, instead, assert that the [Estates'] do not have the evidence to prove their claims. [Comfort Keepers'] motion is, therefore, properly a summary judgment motion.

Luckily for [Comfort Keepers], there are procedural and substantive safe harbors. First, [Comfort Keepers'] motion—as a summary judgment motion—is timely because they presented it to this court more than 45 days prior to trial. *See* Cook Cnty. Cir. Ct. R. 2.1(f). Second, there is no prejudice to any of the parties to consider the motion to dismiss as a summary judgment motion since, on appeal, if any, this court's ruling will be subject to *de novo* review."

¶ 17 Turning to the summary judgment analysis, the trial court noted that the Estates did not rely upon the client care agreement but rather pointed to common law. The trial court considered the traditional common-law duty analysis and found that the incident was not foreseeable because Ms. Reyes did not know that Mr. Kean had left his car idling in the garage. After concluding that there was no common-law duty in place against Ms. Reyes or Comfort Keepers concerning Mr. Kean leaving the car running and releasing carbon monoxide, the trial court also found that the client care agreement established the duties owed. Looking at the client care agreement, the trial court stated:

"First, as to [Mr. Kean], the care plan appended to his client care agreement assigned [Ms.] Reyes limited tasks of assisting with bathing, dressing, toileting, reminding to take medications, as well as housekeeping, laundry, linen changing, and grocery shopping. The agreement neither states explicitly nor contemplates a duty to protect [Mr. Kean] from harming himself or others. Neither the client care agreement nor the care plan identifies a duty to ensure that a car's ignition be turned off after [Mr. Kean] drove. Second,

as to [Mrs. Kean], the care plan provides a longer list of [Ms. Reyes'] duties. These included various types of light housekeeping, laundry, personal care, and assistance with ambulation, including the use of a gait belt. Under the 'other services or notes' section, the use of a wheelchair and stair lift are indicated, but no other additional services are identified.

Neither [Mr. Kean's] nor [Mrs. Kean's] client care agreement or care plan explicitly or implicitly imposed a duty on [Ms.] Reyes to control in any manner the operation of a motor vehicle. Such an omission is consistent with [Ms.] Reyes' general unfamiliarity with vehicles. [Ms.] Reyes did not own or drive a car, and she did not have a driver's license. She had never operated [Mr. Kean's] car. If the contract had imposed on [Ms.] Reyes a duty as to the use of a motor vehicle, such a provision would have been fundamentally at odds with [Ms.] Reyes' lack of abilities in that area."

The trial court further noted that the client care agreement did not require Ms. Reyes to investigate the source of an odd odor or to evacuate the Keans in an emergency situation.

¶ 18   Additionally, the trial court focused on the provision in the client care agreement that precluded liability for any claims "arising out of the operation of a motor vehicle that is not being operated or controlled by a Comfort Keepers employee." The trial court stated, "It is plain that [Mr. Kean's] car was still operating because its engine remained on as a result of [Mr. Kean's] forgetfulness." Noting that Ms. Reyes never operated Mr. Kean's car at any time, the court held that, "even if any other portion of the care agreements or plans could be interpreted to impose a contractual duty on [Ms.] Reyes vis-à-vis [Mr. Kean's] car, the plain language of the exculpatory clause [about operation of a vehicle] absolves [Comfort Keepers] of any liability they might have otherwise owed to the [Keans]."

¶ 19 The trial court's order concluded by granting summary judgment in favor of Comfort Keepers on the basis that it did not owe a duty of care to either prevent the carbon monoxide poisoning or to rescue the Keans. The trial court's order dismissed the case with prejudice.

¶ 20 On August 5, 2020, the Estates filed a notice of appeal challenging the trial court's order granting summary judgment. On August 10, 2020, the Estates filed a motion to supplement the record on appeal. The motion sought to add the deposition transcripts of three expert witnesses. The three expert witnesses had previously been listed in the witness disclosure list, but their depositions were never added to the record.

¶ 21 On August 26, 2020, the trial court denied the Estates' motion. In so ruling, the trial court noted that Illinois Supreme Court Rule 329 (eff. July 1, 2017) allows a record on appeal to be supplemented when there are "[m]aterial omissions or inaccuracies" but that that was not the case here. The trial court stated:

"This court never considered the deposition transcripts of the [Estates'] three disclosed Rule 213(f)(3) witnesses because the [Estates] never provided them. The [Estates] cannot now seek to supplement the record on appeal with testimony the [Estates] chose not to provide this court."

This appeal followed.

¶ 22 ANALYSIS

¶ 23 On appeal, the Estates challenge both the trial court's order granting summary judgment in favor of Comfort Keepers and the trial court's order denying their motion to supplement the record on appeal. We have jurisdiction to consider the trial court's order granting summary judgment, as the Estates filed a timely notice of appeal. See Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017). However, on appeal, the Estates also challenge the trial court's order denying their

motion to supplement the record on appeal, which occurred *after they filed their notice of appeal*. Significantly, the Estates did not file a new notice of appeal for that order, nor did they amend their notice of appeal to include it. And it is well established that a court of review considers only the judgments or parts of judgments specified in the notice of appeal. *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 20.

¶ 24    This principle equally applies to postjudgment motions concerning a new claim. Indeed, Rule 303(a)(2) provides:

> "A party intending to challenge an order disposing of any postjudgment motion *or separate claim*, or a judgment amended upon such motion, *must file a notice of appeal, or an amended notice of appeal within 30 days of the entry of said order or amended judgment*, but where a postjudgment motion is denied, an appeal from the judgment is deemed to include an appeal from the denial of the postjudgment motion." (Emphases added.) Ill. S. Ct. R. 303(a)(2) (eff. July 1, 2017).

A committee comment on Rule 303 explains: "Note that under subparagraph (a)(2), there is no need to file a second notice of appeal where the postjudgment order simply denies the appellant's postjudgment motion. However, *where the postjudgment order grants new or different relief than the judgment itself, or resolves a separate claim, a second notice of appeal is necessary to preserve an appeal from such order*." (Emphasis added.) Ill. S. Ct. R. 303, Committee Comments (adopted Mar. 16, 2007). Here, the Estates' motion was not directed against the trial court's judgment granting summary judgment, such as a motion to reconsider. See *In re Marriage of Valkiunas*, 389 Ill. App. 3d 965, 968 (2008) (to qualify as a postjudgment motion, a motion must request at least one of the forms of relief specified in section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2006)), namely, rehearing, retrial, modification, vacation, or other relief *directed*

*against the judgment*). Rather, it was a motion to supplement the record on appeal, which was a *new, separate claim*. As the Estates did not file a new notice of appeal concerning the trial court's judgment denying their motion to supplement the record, nor did they amend their previous notice of appeal to include it, we do not have jurisdiction over that issue on appeal. Thus, we will not consider the Estates' challenge to the trial court's order denying the motion to supplement the record on appeal with the deposition transcripts not previously provided to the trial court.

¶ 25 Turning to the merits of the matter before us, the Estates raise the following issues: (1) whether the trial court erred in *sua sponte* converting Comfort Keepers' motion to dismiss into a motion for summary judgment; and (2) whether the trial court erred in granting summary judgment in favor of Comfort Keepers.

¶ 26 The Estates first argue that the trial court erred in *sua sponte* converting Comfort Keepers' motion to dismiss into a motion for summary judgment. The Estates claim that the trial court's decision to convert the motion after it had been briefed as a motion to dismiss caused both prejudice and unfair surprise to the Estates.

¶ 27 Notwithstanding the *title* of a motion, courts look to the *substance* of the motion to determine which section of the Code of Civil Procedure governs. *Scott Wetzel Services v. Regard*, 271 Ill. App. 3d 478, 481 (1995). Accordingly, a misdesignation of a motion is not necessarily fatal to the moving party. *Id.* "Reversal by reason of misdesignation is only required where the nonmovant has been prejudiced by the error ***." *Id.*

¶ 28 In the instant matter, Comfort Keepers filed a motion to dismiss pursuant to section 2-619 on the basis that it did not owe a duty to the Keans concerning the carbon monoxide incident. The parties fully briefed the issue for the trial court's consideration. After reviewing all the arguments and supporting documents, the trial court determined that the motion was, in essence, a motion for

summary judgment. This was proper based on the *substance* of Comfort Keepers' motion, which attacked the factual sufficiency of the Estates' complaint. See *Barber-Colman Co. v. A&K Midwest Insulation Co.*, 236 Ill. App. 3d 1065, 1073 (1992) (if a defendant wishes to challenge the factual sufficiency of a plaintiff's claim, a summary judgment motion is the proper vehicle, whereas a section 2-619 motion to dismiss asserts other affirmative matters avoiding the legal effect of or defeating the claim). Simply put, the substance, not the caption, controls the motion.

¶ 29     We find that the trial court's *sua sponte* conversion did not amount to prejudice against the Estates. They were still given the opportunity to fully brief the issue regardless of the caption of the motion. Notably, it was a narrow and well-defined issue. See *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 724 (1997). Additionally, it is well established that, aside from the procedural distinction mentioned above, a motion to dismiss pursuant to section 2-619 essentially amounts to a motion for summary judgment. *Id.* Under these circumstances, there was no unfair surprise or disadvantage to the Estates by the trial court's decision to treat the motion to dismiss as a motion for summary judgment. We note that the Estates argue only in a conclusory manner that they were prejudiced, but they do not provide any specific details as to *how or why* they were prejudiced. Curiously, most of their argument is intertwined with their argument about why the trial court erred in denying their motion to supplement the record on appeal, which, as already noted, we are not considering due to lack of jurisdiction. Thus, the Estates were not prejudiced, and so we will not reverse the trial court's decision to *sua sponte* treat Comfort Keepers' motion to dismiss as a motion for summary judgment.

¶ 30     Next, the Estates argue that the trial court erred in granting summary judgment in favor of Comfort Keepers. The Estates assert that Comfort Keepers owed the Keans a common-law duty of care due to its "specialized knowledge in caring for elderly clients reliant on [Comfort Keepers]

for their safety." Under this umbrella argument, the Estates make numerous claims as to why Comfort Keepers owed a common-law duty of care concerning the carbon monoxide incident, including that Ms. Reyes was required to ensure the Keans' home was a safe environment, prepare an emergency preparedness plan for the Keans, and investigate the source of the odor when she smelled it in the stairwell. The Estates also aver that Comfort Keepers should have assigned a second caregiver when Mr. Kean hired Comfort Keepers for himself. Although it is undisputed that Mr. Kean did not want to hire a second caregiver, the Estates argue that, because of Comfort Keepers' specialized knowledge in caring for the elderly, it should have "either required a second caregiver in the Kean home or terminated their contract so that the Keans could find another provider." The Estates argue in the alternative that Comfort Keepers owed the Keans a contractual duty to call 911 or evacuate the Keans from the house. They additionally claim that the client care agreement's provision precluding liability for injuries arising out of the operation of a motor vehicle does not apply here because operating a vehicle means a "moving, driving vehicle." The Estates accordingly argue that the trial court erred in granting summary judgment in favor of Comfort Keepers and ask us to reverse that judgment and remand the case for further proceedings.

¶ 31    The purpose of summary judgment is to determine if a question of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Adams*, 211 Ill. 2d at 43. "Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt." *Wells Fargo*

*Bank, N.A. v. Norris*, 2017 IL App (3d) 150764, ¶ 19. We review appeals from summary judgment rulings *de novo*. *Id.*

¶ 32    Summary judgment was granted in this matter on the basis that the trial court found there was no duty owed by Comfort Keepers to the Keans. In a negligence action, the plaintiff must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from the breach. *Smith v. The Purple Frog, Inc.*, 2019 IL App (3d) 180132, ¶ 11. Whether a duty of care exists is a question of law to be decided by the court. *Rojas Concrete, Inc. v. Flood Testing Laboratories, Inc.*, 406 Ill. App. 3d 477, 480 (2010). When a contract exists between the parties, the scope of duty is determined by the terms of the contract, and a defendant's duties will not be expanded beyond the scope of duties required by the contract. *Id.*

¶ 33    Here, the client care agreement detailed all of Comfort Keepers' and Ms. Reyes' duties to be performed for the Keans. As the trial court noted, nowhere in the client care agreement does it mention requiring Ms. Reyes to ensure Mr. Kean turned off his car or to ensure that the Keans had a carbon monoxide detector in their home. So, it cannot be said that Comfort Keepers contractually owed the Keans such a duty. "The scope of the defendant's duties will not be expanded beyond that required by the contract." *St. Paul Mercury Insurance v. Aargus Security Systems, Inc.*, 2013 IL App (1st) 120784, ¶ 60.

¶ 34    While the client care agreement did provide that Ms. Reyes "*may* call 911 for emergency assistance," that is the extent of any duties imposed on Comfort Keepers regarding medical emergencies. Contrary to the Estates' argument, nothing in the client care agreement required Ms. Reyes to *evacuate* the Keans from the house. The 911 operator did not instruct Ms. Reyes to evacuate the Keans, and the record shows that it would have been physically impossible to carry

them out by herself. Moreover, Ms. Reyes *did* call 911 to get emergency services for the Keans and she refused to evacuate the house herself in order to stay with them until help arrived.

¶ 35    Significantly, the client care agreement had a provision explicitly precluding liability for any injuries "arising out of the operation of a motor vehicle that is not owned or controlled by a Comfort Keepers employee." It is undisputed that the car at issue was owned and controlled by Mr. Kean and that Ms. Reyes never drove it. Nevertheless, the Estates aver that this incident did not arise out of Mr. Kean "operating" the car because he was no longer driving it when it released carbon monoxide into the Keans' home. We reject this argument. Clearly, any incident arising out of *the operation* of the car would fall under this provision, and parking a car in a garage and leaving the engine running would undoubtedly be considered *operating* a car. If the provision intended to apply only to incidents arising out of the *driving* of a car, it would and could have clearly stated such language, but it did not, so we cannot interpret the language that way. See *Shapich v. CIBC Bank USA*, 2018 IL App (1st) 172601, ¶ 18 (where the terms of an agreement are clear and unambiguous, they will be given their plain and ordinary meanings).

¶ 36    Thus, looking at the client care agreement, not only does it not impose a contractual duty of care on Comfort Keepers in any way concerning the carbon monoxide incident, it also explicitly precludes liability under these facts and circumstances.

¶ 37    We nonetheless also consider whether Comfort Keepers owed the Keans a *common-law* duty of care since the Estates argue that in the alternative. Four factors guide our duty analysis: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 14.

¶ 38    Looking at the first factor, the reasonable foreseeability of the injury, it carries very little weight. Nothing in the record suggests that it was reasonably foreseeable that Mr. Kean would leave his car running inside the garage. He was considered mentally alert and had never left the car running before, not to mention that there was no reason for Comfort Keepers to suspect that the Keans' home did not have a carbon monoxide detector. This is true notwithstanding whether Ms. Reyes smelled an unfamiliar odor at one point in the night, as an unfamiliar odor does not necessarily indicate a dangerous situation, especially since she asked Mr. Kean about the smell and he said it was probably just something from outside, and Ms. Reyes was unable to find the source of the odor from inside the house. Under those circumstances, it cannot be said that Ms. Reyes or Comfort Keepers should have foreseen that Mr. Kean would leave his car running inside the attached garage and allow it to release carbon monoxide into the Keans' home where there was no carbon monoxide detector. See *Schmid v. Fairmont Hotel Co.-Chicago*, 345 Ill. App. 3d 475, 485 (2003) (the creation of a legal duty requires more than a mere possibility of occurrence; if an event is highly extraordinary or unique, then the occurrence is not reasonably foreseeable).

¶ 39    The second factor, the likelihood of injury, also carries little weight for similar reasons. As Mr. Kean did not have a history of leaving his car engine running nor was there any suggestion of a history of forgetfulness, it was a very unlikely occurrence. And considering that the Carbon Monoxide Alarm Detector Act requires homes to be equipped with carbon monoxide detectors, it is unlikely that someone would unknowingly be exposed to carbon monoxide long enough for it to be fatal.

¶ 40    For the third and fourth factors, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the defendant, we must consider what it would mean to require Comfort Keepers to ensure that its clients' homes are in accordance with all safety

acts, including the Carbon Monoxide Alarm Detector Act. Comfort Keepers does not provide housing for its clients; rather it has its employees come into the clients' homes and aid them with caretaking tasks. It would be a vast burden on Comfort Keepers to ask their employees, who are already tasked with all the caretaking responsibilities, to also ensure the clients' homes are up to State code.

¶ 41    While it would not be too much of a burden to have Comfort Keepers' caregivers ensure that all cars are turned off after use, that is not sufficient to impose a duty of care when weighing everything else. Besides, that is not the extent of the duty the Estates seek to impose. For instance, the Estates aver that Comfort Keepers should have recognized that the Keans needed a second caregiver and then quit when Mr. Kean refused to hire a second one. This is a specious argument. Requiring Comfort Keepers to give up business simply because a client will not hire a second caregiver for one household goes against common sense, and it would be unjustified to impose such a burden. See *Sameer v. Butt*, 343 Ill. App. 3d 78, 91 (2003) (requirements that would create an erroneous economic burden will not be imposed).

¶ 42    Thus, after weighing the four factors, we find that Comfort Keepers did not owe a common-law duty of care to the Keans concerning the carbon monoxide incident. The trial court therefore properly granted summary judgment in favor of Comfort Keepers.

¶ 43                                CONCLUSION

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.

**No. 1-20-0851**

| | |
|---|---|
| **Cite as:** | *Pasquinelli v. Sodexo, Inc.*, 2021 IL App (1st) 200851 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-010395; the Hon. John H. Ehrlich, Judge, presiding. |
| **Attorneys for Appellant:** | Lisa M. Longo and Michael G. Miller, of Morici, Longo & Associates, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Stuart N. Rappaport, of Law Office of Izzo, Rappaport & Stiefbold, of Chicago, for appellees. |