2024 IL App (1st) 230830-U

No. 1-23-0830

Order filed July 17, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| XAVIER PATTERSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 3053 |
| | ) | |
| VILLAGE OF RIVER FOREST and SETH DEYOUNG, | ) | Honorable |
| | ) | Scott D. McKenna, |
| Defendants-Appellees. | ) | Judge, presiding. |

---

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Where plaintiff sued the village and the detective for malicious prosecution, the defendants were entitled to summary judgment because there was probable cause to believe the plaintiff had committed criminal sexual assault.

¶ 2   After plaintiff Xavier Patterson was acquitted of the charge of criminal sexual assault of a college classmate, he sued defendant Seth DeYoung, a former detective of the River Forest Police Department (RFPD), for malicious prosecution. Plaintiff also sued defendant Village of River Forest (the Village) for derivative claims of *respondeat superior* and indemnification. The case

was fully litigated through discovery, after which the circuit court awarded summary judgment in favor of defendants and against plaintiff on the basis that probable cause supported plaintiff's charging.

¶ 3    On appeal, plaintiff argues that defendants were not entitled to summary judgment because a reasonable jury could find that the classmate's allegations lacked credibility and thus failed to confer probable cause to prosecute plaintiff. Plaintiff also argues that the circuit court's summary judgment rests on an impermissible credibility determination.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    On the morning of May 4, 2011, RFPD Officer Sarah Arrigo was dispatched to a university campus regarding a report of criminal sexual assault. At the university, security personnel said that they had received a telephone call from Jane Doe's mother, who advised security that someone gained access to her daughter's dorm room and made her do things that she did not want to do. Jane, her mother, and her boyfriend were in Jane's room waiting for the police. The security supervisor walked Jane, her mother, and her boyfriend to another room where Officer Arrigo obtained statements from them. Officer Arrigo's report does not indicate that she spoke to Jane in the presence of her mother and boyfriend.

¶ 7    According to Officer Arrigo's case report, Jane's boyfriend received several text messages from Jane to the effect of "wake up," "emergency," and "I want to go home." He told Officer Arrigo that when he spoke to Jane by telephone, she told him that she was up late studying for a

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

final examination, fell asleep, and woke up with a person pulling down her pants. Jane's boyfriend said that Jane was crying and provided no further details. He then telephoned Jane's mother and advised her of the situation. Jane's mother spoke to Jane and then told Jane's boyfriend that someone forced Jane to have sex. Jane's boyfriend was aware that Jane let another student into her dorm room while she studied, but that student left the room.

¶ 8    Jane's mother told Officer Arrigo that when Jane's mother received the telephone call from Jane's boyfriend at 9 a.m. on May 4, he said that someone went into Jane's room and pulled down her pants. Jane's mother then telephoned Jane, who said that she wanted to pretend that the incident did not happen. Jane then explained that at 11 p.m., she was in her room studying for a final exam when plaintiff, a fellow student and acquaintance, knocked on her door. Jane allowed plaintiff into the room, but he left at some point. Soon Jane went to sleep and woke up with plaintiff on top of her. Jane's mother asked Jane if plaintiff was naked and if he raped her, and Jane replied, "Yes."

¶ 9    When Jane talked to Officer Arrigo, Jane identified plaintiff by name and said that he was her friend. They had met through Jane's ex-roommate, who had moved out of the room two weeks before the incident. Jane was never in a relationship with plaintiff and had never been sexually intimate or affectionate with him. At 11 p.m. on May 3, she was studying in her room for a final exam and listening to music when plaintiff knocked on her door. She allowed plaintiff into her room and they spoke briefly about her French class. Plaintiff laid down on Jane's bed while she sat on the edge of the bed, studying on her laptop. Plaintiff soon fell asleep on top of the blanket, facing the wall. At midnight, Jane went to bed underneath the blanket, facing away from plaintiff, and quickly fell asleep. When she woke up, she was on her stomach and her leggings were pulled down. Plaintiff was on top of her and, without her consent, had inserted his penis into her vagina.

She started to move and pushed plaintiff away from her with her legs. She turned to her side and plaintiff exited the bed and left the room. There was no conversation between her and plaintiff prior to or after the incident. Neither she nor plaintiff were under the influence of alcohol or narcotics at the time. Jane then attempted to reach her boyfriend by text and telephone. Officer Arrigo accompanied Jane to her dorm room where Jane described the locations and positions during the incident. Jane did not know if plaintiff used a condom or ejaculated but she pointed out to Officer Arrigo an area of the bed that was wet after plaintiff had exited the bed.

¶ 10    Later that same morning of May 4, defendant DeYoung, who had been an RFPD officer since 2002 and detective since 2007, was assigned to investigate. After being informed of Jane's complaint by Officer Arrigo, DeYoung proceeded to the hospital where Jane was present with her family members. Jane, who was waiting for an examination and sexual assault kit to be completed by hospital staff, appeared "confused, hunched over, distraught," and in "a very defeated posture." As a result, DeYoung provided Jane with his contact information so that they could discuss her case once she was discharged.

¶ 11    At 6:50 p.m. that same evening of May 4, DeYoung interviewed Jane at the RFPD. DeYoung observed that Jane's demeanor appeared just as it did at the hospital: "broken, crushed, distraught, very upset." After DeYoung read Jane warnings from a photographic array form—which Jane signed, indicating that she understood the warnings and wished to view the array—Jane immediately identified the photograph of plaintiff as her assailant, signed her name above his photo, provided DeYoung with plaintiff's name, and told DeYoung that she knew plaintiff well, as they were friends.

¶ 12   Jane then explained to DeYoung that after allowing plaintiff into her room around 11 p.m. on May 3, they discussed final exams, and plaintiff at one point fell asleep on Jane's bed on top of her blanket while Jane studied. Jane told DeYoung that she continued studying until around midnight, at which time she laid down at the edge of her bed—under the blankets and facing away from plaintiff—and quickly fell asleep from exhaustion. Jane continued that, at some point during the night, she awoke due to discomfort in her vaginal area. She noticed that her pants and underpants were down by her knees and ankles and realized that plaintiff was penetrating her vagina from behind with his penis. Jane stated to DeYoung that she then tensed up or wiggled, after which plaintiff got off her, pulled up his shorts, and left the room without either person speaking.

¶ 13   Jane told DeYoung that after plaintiff left her room, she called her boyfriend. When he failed to answer, she texted him several times that he needed to immediately come get her. Jane showed DeYoung the text messages she had sent to her boyfriend between 1:59 a.m. and 2:32 a.m. on May 4. Because her boyfriend did not respond, Jane explained that she showered and fell asleep, until she awoke around 8:30 a.m. due to a call from her boyfriend, at which time she described to him what happened.

¶ 14   Jane told DeYoung that she had no prior sexual contact with plaintiff and only considered him a friend. She said she did not give plaintiff consent to perform any sexual act on her, including penetrating her vagina with his penis. Jane also told DeYoung, who had never met Jane or plaintiff before this investigation, that she would sign a criminal complaint against plaintiff. During her interview with DeYoung, Jane was upset and cried, which caused DeYoung to pause the interview several times so Jane could compose herself. Before leaving the RFPD, Jane submitted buccal and

pubic hair standards, and she signed a medical request form allowing DeYoung to obtain her emergency room records. Jane also swore out a complaint against plaintiff for criminal sexual assault.

¶ 15 The following afternoon of May 5, 2011, DeYoung interviewed plaintiff at the RFPD. Plaintiff admits that, during this interview, he told DeYoung that he went to Jane's room, engaged in sexual contact with Jane, became frustrated because the sexual contact was twice interrupted, lost his erection, and left Jane's room. Plaintiff also states on appeal that he told DeYoung that "Jane was fully awake and never stopped him."

¶ 16 Later that same evening, around 9 p.m. on May 5, DeYoung asked Cook County Assistant State's Attorney (ASA) John Reich, who was assigned to the felony review unit of the State's Attorney's office, to respond to the RFPD. The felony review unit is a 24-hour unit that assists police departments with evaluating cases and evidence, determines the appropriate criminal charges, interviews witnesses, victims, and suspects, and documents statements when necessary. When a potential felony crime is called in for review, the assigned ASA ultimately decides whether to approve charges. It was ASA Reich's job to review the evidence and determine if criminal charges should be filed. It was the responsibility of the police officer or detective to physically file the charges.

¶ 17 Upon arrival at the RFPD, ASA Reich interviewed Jane Doe, Jane's mother, and Jane's boyfriend. Jane told ASA Reich essentially what she had told DeYoung: that plaintiff, without her consent, penetrated her vagina with his penis as she slept. Then—after ASA Reich advised plaintiff that he was a prosecutor and was not plaintiff's attorney, and read plaintiff his *Miranda* (*Miranda v. Arizona*, 384 U.S. 436 (1966)) warnings—ASA Reich interviewed plaintiff in DeYoung's

presence. On a State's Attorney's office fact sheet, ASA Reich memorialized that plaintiff admitted to the same events related by Jane, namely, that he placed his penis into Jane's vagina while believing she was asleep and unable to give consent.

¶ 18    At approximately 12:30 a.m. on May 6, 2011, ASA Reich approved one count of criminal sexual assault against plaintiff. ASA Reich testified that he believed that this investigation was the first time he had ever spoken with DeYoung, and that neither DeYoung nor anyone else at the RFPD pressured Reich to approve charges. The independent decision to charge was ASA Reich's alone, based upon his interviews of Jane, her mother, her boyfriend, and plaintiff. ASA Reich did not find that DeYoung misrepresented any information, and Reich did not recall any problems with DeYoung's conduct of the investigation.

¶ 19                                    II. ANALYSIS

¶ 20    Summary judgment should be granted where the pleadings, depositions, admissions, and affidavits on file show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Pasquinelli v. Sodexo, Inc.*, 2021 IL App (1st) 200851, ¶ 31 (citing 735 ILCS 5/2-1005(c) (West 2020)). "If the plaintiff cannot establish any element of his cause of action, summary judgment is proper." *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 28. This court "review[s] appeals from summary judgment rulings *de novo*." *Pasquinelli*, 2021 IL App (1st) 200851, ¶ 31. To that end, this court "may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct." *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 50.

¶ 21    Here, the tort of malicious prosecution is the only cause of action at issue. "Suits for malicious prosecution are not favored in the law," as "[p]ublic policy favors the exposure of

crime," such that "the circumstances in which malicious prosecution actions may be brought have been rather narrowly circumscribed" and are "subject to more stringent limitations than other tort actions." (Citations and internal quotation marks omitted.) *Beaman v. Freesmeyer*, 2019 IL 122654, ¶¶ 24-25. "To succeed on a claim of malicious prosecution, the plaintiff must establish '(1) the commencement or continuation of an original criminal or civil proceeding by the defendant, (2) the termination of the proceeding in favor of the plaintiff, (3) the absence of probable cause for such proceeding, (4) malice, and (5) damages.' " *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶ 67. "[T]he absence of any one of the elements bars a plaintiff from pursuing a claim for malicious prosecution." *Burrell v. Village of Sauk Village*, 2017 IL App (1st) 163392, ¶ 20 (affirming summary judgment for defendant officers and village based on presence of probable cause). Plaintiff's challenge on appeal involves only one of the five elements—*i.e.*, whether DeYoung lacked probable cause.

¶ 22    Plaintiff argues that the circuit court should not have resolved the probable cause inquiry at summary judgment because a question of fact existed as to whether Jane's statements to the officers were sufficiently credible where her reported outcry statements were materially inconsistent with her later statements. Plaintiff asserts that Jane's initial statements, as reported by her boyfriend and her mother to Officer Arrigo, and that Jane's mother's statement to university security personnel, incorrectly implied or indicated that either the assailant was an unknown intruder, or plaintiff gained access to Jane's room without her permission, or plaintiff left her room and then came back uninvited. Jane omitted the fact that plaintiff was asleep on her bed when she went to bed at midnight and fell asleep. Furthermore, whereas Jane's boyfriend told Officer Arrigo that Jane said she woke up with a person pulling down her pants, Detective DeYoung reported that

Jane said she woke up due to vaginal discomfort because plaintiff's penis was inside her vagina and Jane, who was a sound sleeper, did not awake when plaintiff pulled her pants and underpants down. Plaintiff asserts that these are major inconsistencies and a jury could conclude that these were deliberate distortions. According to plaintiff, Jane changed crucial facts, which shows inconsistencies and unreliability and thus fails to confer probable cause, or so a reasonable jury could conclude.

¶ 23    Defendants respond that plaintiff's argument is not only wrong on its face, but its consequences are deeply troubling because the law is clear that officers should refrain from weighing the credibility of sexual assault complainants' accounts and instead let criminal trials sort out such reliability questions. See *Holt*, 2022 IL App (1st) 220400, ¶ 80. Defendants warn that the theory of plaintiff's argument would flip the law on its head and essentially force officers investigating sexual assault claims to usurp the functions of prosecutors, judges, and juries, and decide for themselves whether victims should be believed. Defendants add that there are diverging versions of what plaintiff told DeYoung during plaintiff's May 5 pre-arrest interview. Thus, to avoid issues of material fact, defendants do not argue that probable cause existed based upon anything DeYoung further gleaned from plaintiff's interview.

¶ 24    This court has broadly defined probable cause as " 'a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged.' " *Id.* ¶ 68 (quoting *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 654 (2006)). Critically, "probable cause does not require evidence sufficient to convict." *People v. DeLuna*, 334 Ill. App. 3d 1, 13 (2002). Rather, " '[p]robable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an

officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred.' " *Holt*, 2022 IL App (1st) 220400, ¶ 68 (quoting *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021)). As a result—and as here—"[a] person should not be held liable for malicious prosecution merely because the accused was not convicted." *Holt*, 2022 IL App (1st) 220400, ¶ 68.

¶ 25   In addition—and again, as here—"[w]hen the victim of the crime supplies the police with the information forming probable cause, there is a presumption that the information so provided is inherently reliable." *Id.* Similarly, " '[m]any putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established.' " *Id.* ¶ 82 (quoting *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999)). Illinois law provides that "[p]robable cause is an objective standard, and an officer's subjective belief as to the existence of probable cause is not determinative." *People v. Buss*, 187 Ill. 2d 144, 209 (1999).

¶ 26   After reviewing the record, we conclude that the circuit court did not err in finding no genuine issue of material fact existed as to whether there was probable cause to arrest plaintiff and charge him with criminal sexual assault. Initially, Jane identified to her mother and Officer Arrigo a specific individual by name—a college friend whom she knew prior to the occurrence—as the perpetrator of a sexual assault against her. DeYoung's investigation confirmed that plaintiff did have sexual contact with Jane, and Jane adamantly insisted the sex was nonconsensual. In so doing, Jane appeared visibly shaken. In addition, across multiple interviews, Jane never wavered from the material aspects of her account: plaintiff was present in Jane's room; he initiated sexual penetration with Jane; the sex was nonconsensual.

¶ 27 The information Jane provided to DeYoung falls comfortably within the rule that the identification of a suspect by a putative victim establishes probable cause as a matter of law, particularly when coupled with plaintiff's admission that he engaged in sexual contact with Jane at the same time and place identified by Jane in her account. See *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 121 (collecting decades of caselaw demonstrating that victim identification of a suspect, coupled with the suspect's undisputed presence at or near the crime scene, establishes probable cause). At a minimum, the evidence against plaintiff was more than sufficient to " 'lead a person of ordinary caution and prudence to believe or to entertain an honest and sound suspicion' " that plaintiff committed the crime. *Holt*, 2022 IL App (1st) 220400, ¶ 68 (quoting *Sang Ken Kim*, 368 Ill. App. 3d at 654).

¶ 28 Plaintiff, however, challenges the credibility of Jane and her statements. Specifically, plaintiff argues that an issue of fact precluded summary judgment on probable cause grounds because Jane's "account of her alleged sexual assault was *** riddled with inconsistencies," and for the circuit court to credit said account, it necessarily "engaged in impermissible credibility determination and evidence weighing."

¶ 29 Initially, plaintiff's argument—that Jane's statements were too inconsistent for any reasonable officer to find them credible—violates unambiguous law requiring officers to refrain from engaging in precisely these sorts of credibility judgments in assessing probable cause. As this court held in the context of sexual assault, "[t]he credibility of a putative victim or witness is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial." (Citation and internal quotation marks omitted.) *Holt*, 2022 IL App (1st) 220400, ¶ 80. "[A]s long as [the victim's report] is not so incredible as to make the officer's belief that

plaintiff committed a crime unreasonable," then the officer is "entitled to act on the basis of observable events and let courts resolve conflicts about mental states." (Citation and internal quotation marks omitted.) *Id.*

¶ 30    A suspect's contention that a reporting victim should not be believed when she asserts that the sexual contact was nonconsensual raises the matter of consent, which is a legal "affirmative defense" frequently raised by criminal defendants in sexual assault cases. *People v. Lamonica*, 2021 IL App (2d) 200136, ¶ 37. The validity of affirmative defenses is a matter for criminal court judges and juries, rather than police officers, who have "no duty to investigate the validity of any defense." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)).

¶ 31    To hold in this case that DeYoung lacked probable cause based on credibility grounds would require the court to find that DeYoung should have disbelieved Jane when she told him she was sexually assaulted by plaintiff. As described above, that is functionally the opposite of what probable cause is meant to encapsulate. "Police are *entitled* to act on information that may be inaccurate and let the courts determine whether to credit a suspect's claim of innocence." (Emphasis added.) *Ross v. Mauro Chevrolet*, 369 Ill. App. 3d 794, 800 (2006). Where the involved parties each confirm that they had sexual contact, the suspect says "the sex was consensual," the complainant says "she had been raped," and "no evidence indicat[es the complainant's] account was so incredible that believing her was unreasonable," judgment as a matter of law on probable cause grounds is appropriate. *Holt*, 2022 IL App (1st) 220400, ¶ 80.

¶ 32    Here, the inconsistencies identified by plaintiff do not amount to objective incredibility. Plaintiff asserts that Jane "changed crucial facts depending on who was present" when she related

her story. The record does not support plaintiff's assertion. Although Jane's initial outcry statements, as reported to the police by her boyfriend and her mother, did not exactly match all the details of her later accounts to Officer Arrigo and Detective DeYoung, the material aspects of those accounts—that plaintiff was present in Jane's room; he initiated sexual contact with Jane; the contact was nonconsensual—were consistent throughout.

¶ 33     It is not surprising that Jane's initial statements to her boyfriend and mother—while Jane initially processed what happened to her at the hands of her purported friend—were not exact matches to her later statements to Officer Arrigo and Detective DeYoung. According to the record, Jane wanted to pretend that the assault did not happen, indicating that she likely felt ashamed for trusting someone who was not worthy of her trust. Thus, any absence in her accounts to her boyfriend and mother of the fact that she went to bed under the blanket after plaintiff had fallen asleep on top of her bed does not render Jane's reports to the police so incredible as to make DeYoung's belief that plaintiff committed criminal sexual assault unreasonable. See *Holt*, 2022 IL App (1st) 220400, ¶ 80. The law expressly provides that probable cause is not undermined by victim statements that suffer from immaterial inconsistencies. *Sang Ken Kim*, 368 Ill. App. 3d at 657 (probable cause is not defeated by an "inconsistency [that] was [not] serious enough to deprive defendants of an honest and sound suspicion that the accused committed the offense charged" (citation and internal quotation marks omitted)).

¶ 34     Plaintiff also argues that DeYoung "admitted" that Jane's claims were unreliable when, at the grand jury three weeks after plaintiff was charged, DeYoung responded to a grand juror's inquiry that "I know when you first hear the story, you're like come on." Plaintiff's argument lacks merit. DeYoung's complete answer at the grand jury clearly reveals that he was actually explaining

why he did not discount Jane's allegation. After making that comment, DeYoung immediately told the grand jury why that initial reaction would be wrong: specifically, Jane explained that since she was a "deep sleeper," she did not realize that plaintiff was lowering her pants and underwear prior to the alleged penetration. Moreover, even if it were true that DeYoung doubted Jane's story—he did not—"[p]robable cause is an objective standard, and an officer's subjective belief as to the existence of probable cause is not determinative." *Buss*, 187 Ill. 2d at 209; see *Booker v. Ward*, 905 F. Supp. 483, 487 (N.D. Ill. 1995) ("whether the police officer actually believed he or she had probable cause or had other motives (good or bad) for arresting the person are not considerations").

¶ 35    Plaintiff's reference to the first grand jury returning a "No Bill" before a second grand jury returned the indictment is of no consequence to the probable cause analysis. As a matter of unambiguous Illinois law governing probable cause in malicious prosecution cases, "the return of a 'no true bill' by the grand jury does not raise an inference that [a person of ordinary care and prudence] did not honestly believe that the actions by [the arrestee] constituted" a crime. *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 936 (1980). Nor is the fact that plaintiff was later found not guilty at trial relevant, as probable cause does not require evidence sufficient to support a conviction. *DeLuna*, 334 Ill. App. 3d at 13.

¶ 36    To support his credibility argument, plaintiff cites *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635 (2002), where the court held that a genuine issue of material fact existed as to whether the city and police chief acted maliciously in prosecuting a day care provider for allegedly sexually abusing children in her daycare. Specifically, plaintiff cites *Fabiano* for its proposition that the question of whether a statement is sufficiently reliable to support probable cause in a malicious prosecution case is for the jury at trial. *Id.* at 642. However, plaintiff's reliance on *Fabiano* is

misplaced because the cited proposition is irrelevant in the present context. In *Fabiano*, the court was referring to "hearsay statements [that] are urged to establish probable cause," which "must be shown to be reliable." *Id. Fabiano* did not address eyewitness statements supporting probable cause, let alone eyewitness victim statements in the specific context of sexual assault cases—which are instead governed by *Holt* and *Sang Ken Kim*. Plaintiff also cites *Fabiano* to support his "major inconsistencies" contention. See *Fabiano*, 336 Ill. App. 3d at 642. Again, this section of *Fabiano* is exclusively concerned with hearsay statements. *Fabiano* has no bearing on the credibility of Jane's non-hearsay statements or the credibility of Jane herself.

¶ 37    Plaintiff also cites *Fuller v. Benny's Corner Bar & Grill, Inc.*, 2022 IL App (3d) 180670, a dramshop action against four liquor establishments arising from a fatal motor vehicle crash, for the proposition that the circuit court here made an inappropriate credibility determination. But the *Fuller* promulgation of that principle arose out of a sharp dispute of fact between the parties as to whether the driver who caused the crash was intoxicated at the time of the crash. *Id.* ¶ 104. There were competing eyewitness accounts supporting both versions of events—that the driver did not appear to be drunk; or that he did. *Id.* ¶¶ 104-05. The court simply found that it was not appropriate for the trial court to determine at summary judgment which of those accounts was more likely than the other, in part because it is the jury's job, and not the court's, to weigh those witnesses' credibility. *Id.* ¶ 105.

¶ 38    This noncontroversial summary judgment fundamental principle—that a court is not to engage in credibility determinations at summary judgment—does not adversely affect the vastly different criminal law fundamental principle that probable cause lies as a matter of law where a victim makes multiple statements to officers and the material aspects of her statements, especially

her eyewitness identification of a perpetrator of sexual assault, remain consistent. *Sang Ken Kim*, 368 Ill. App. 3d at 657, 660 (affirming summary judgment "for defendants and against the plaintiff on the claims of malicious prosecution because there was no genuine issue of material fact as to whether probable cause existed at the time of arrest and the defendants were entitled to judgment as a matter of law"). The latter principle does not require a court to make a "credibility" determination at all, which is all that was discussed in *Fuller*. Rather, the latter principle merely requires the court to simply look at whether the victim's statements were consistent enough in their material components to provide " 'an officer [with] enough information to warrant a prudent person to believe criminal conduct has occurred.' " *Holt*, 2022 IL App (1st) 220400, ¶ 68 (quoting *Young*, 987 F.3d at 644).

¶ 39    That is all that DeYoung did at the time of the incident, and that is all the circuit court did here. Contrary to plaintiff's arguments, DeYoung and the lower court refrained from making credibility judgments. They simply looked at the information available to DeYoung and determined that, pursuant to the clear law governing victim identifications of perpetrators of sexual assault, probable cause was present.

¶ 40    Accordingly, we affirm the circuit court's decision granting summary judgment in favor of defendants because our review of the record establishes that probable cause existed to arrest and charge plaintiff with criminal sexual assault. Furthermore, summary judgment for DeYoung on the malicious prosecution claim necessarily quashes plaintiff's *respondeat superior* and indemnification claims against the Village, which were dependent on the malicious prosecution claim against DeYoung. See *Beaman v. Freesmeyer*, 2019 IL App (4th), 160527, ¶ 128, *rev'd on other grounds*, 2021 IL 125617. Based on our ruling, we do not address defendants' alternative

argument that summary judgment is also appropriate based on plaintiff's failure to establish the element of his malicious prosecution claim regarding the commencement or continuance of an original criminal proceeding by DeYoung.

¶ 41                                    III. CONCLUSION

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 43    Affirmed.