2022 IL App (3d) 180670

Opinion filed June 9, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| LAURA E. FULLER, as Administratrix of the Estate of Joshua W. Fuller, Deceased, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BENNY'S CORNER BAR & GRILL, INC., an Illinois Corporation; WOPPERS, INC., an Illinois Corporation; JJDM, INC., d/b/a Elmwood Tap, an Illinois Corporation; and JOSEPH RYNEARSON f/d/b/a Trojan's Corner, | ) ) ) ) ) ) ) | Appeal No. 3-18-0670 Circuit No. 16-L-72 |
| | ) | |
| Defendants | ) ) | |
| (Benny's Corner Bar & Grill, Inc., Woppers, Inc., and Joseph Rynearson f/d/b/a Trojan's Corner, | ) ) ) | Honorable |
| | ) | Michael P. McCuskey |
| Defendants-Appellees). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.
Justices Schmidt and Lytton concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    Plaintiff, Laure E. Fuller (plaintiff), as the administratrix of the estate of Joshua W. Fuller (Fuller), filed a dramshop action pursuant to section 6-21 of the Liquor Control Act of 1934 (Dramshop Act) (235 ILCS 5/6-21 (West 2014)) against four dramshop establishments, including defendants, Benny's Corner Bar & Grill, Inc. (Benny's Corner Bar), Woppers, Inc. (Woppers), and Joseph Rynearson f/b/d/a Trojan's Corner (Trojan's Corner) for injuries that resulted in Fuller's death and for medical and funeral expenses incurred by Fuller's estate. Plaintiff subsequently filed a motion to amend the complaint to add her own claim for loss of society, individually as Fuller's mother, and to add claims for loss of society on behalf of Fuller's father, brother, and two sisters. The trial court denied plaintiff's motion to amend. Defendants, thereafter, filed a motion for summary judgment, which the trial court granted. Plaintiff appealed, arguing the trial court erred in denying her motion for leave to amend the complaint and erred in granting defendants' motion for summary judgment. We affirm in part and reverse in part the trial court's grant of summary judgment, affirm its denial of plaintiff's motion to amend, and remand for further proceedings.

¶ 2                                   I. BACKGROUND

¶ 3    On April 15, 2016, plaintiff (administratrix of Fuller's estate) filed a complaint against four bars alleging a cause of action under the Dramshop Act (*id.*). Specifically, plaintiff alleged prior to 1 a.m. on April 16, 2015, Dillon Nolan had purchased and ingested alcoholic beverages from defendants, which caused Nolan to become intoxicated; at approximately 1 a.m. on April 16, 2015, Nolan was operating his pickup truck and lost control of his vehicle; and as a direct and proximate cause of Nolan's intoxication, Nolan's vehicle veered off the road, the vehicle rolled over, Fuller was ejected from the vehicle, and Fuller suffered serious and fatal injuries that caused Fuller's death and caused Fuller's estate to incur medical and funeral expenses. Plaintiff

2

requested a judgment against each defendant in excess of $50,000, costs of the suit, and any other relief the court found fair and just.

¶ 4                           A. Motion for Leave to Amend the Complaint

¶ 5        On November 3, 2017, plaintiff filed a motion for leave to amend the complaint to add herself, individually, and Fuller's father, brother, and two sisters as plaintiffs for dramshop claims for loss of society against defendants. Although the one-year limitation for filing a loss of society claim under the Dramshop Act had passed, plaintiff argued the loss of society related back to the filing date of the original complaint pursuant section 2-616(b) of the Code of Civil Procedure (Code) (735 ILCS 5/2-616(b) (West 2016)) because the claims grew out of the same transaction or occurrence and did not prejudice defendants. Plaintiff argued that defendants were aware that Fuller's family members were "party to the cause of action through the fact that they were members of the Estate" and, because they were members of Fuller's Estate, defendants knew there had been a loss of society.

¶ 6        In response, defendants noted that the language of the Dramshop Act provides, "any person claiming to be injured in means of support or society and not included in any action brought hereunder may join by motion made within the times herein provided for bringing such action," with additional language providing that each dramshop action "shall be barred unless commenced within one year next after the cause of action accrued" (235 ILCS 5/6-21 (West 2014)). Defendants contended that Dramshop Act's one-year limitation period was a "special and jurisdictional" statute of limitations, which precluded the proposed additional claims that were brought beyond the statute's one-year limitation period. In support of their contention, defendants cited to the Illinois Supreme Court's decision in *Demchuk v. Duplancich*, 92 Ill. 2d 1, 9 (1982), wherein our supreme court held the one-year limitation in the Dramshop Act was "a

3

condition precedent to the right of recovery which must be observed by all plaintiffs in order to bring themselves within the [Dramshop] Act."

¶ 7    In reply, plaintiff argued there was no exception to the relation-back doctrine for claims brought pursuant to the Dramshop Act. In support of this contention, plaintiff noted that in *Litwiller v. Skar Enterprise Inc.*, 2011 IL App (4th) 100870, ¶ 27, the Fourth District Appellate Court held that the trial court in that case had erred in finding the one-year limitation in the Dramshop Act was a condition precedent to jurisdiction or a special jurisdictional statute of limitations.

¶ 8    On May 4, 2018, at the hearing on plaintiff's motion for leave to amend the complaint, the trial court found that under the language of the Dramshop Act, a claim for the recovery for loss of society had to be pled within the one-year period. The trial court entered a written order denying plaintiff's motion for leave to file an amended complaint, indicating that it found the one-year statute of limitations set forth in the Dramshop Act had lapsed and the date of filing for the amended complaint "did not relate back."

¶ 9    Plaintiff subsequently filed a motion to reconsider, arguing the trial court had erroneously relied on the Illinois Supreme Court's decision in *Demchuk* to conclude that the one-year limitation period in the Dramshop Act was "a special and jurisdictional statute of limitation" that barred the application of the relation-back doctrine. Plaintiff argued in refuting our supreme court's reasoning in *Demchuk*, the Fourth District Appellate Court in *Litwiller* had relied on our supreme court's decision in *Belleville Toyota v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 338 (2002), to conclude special and jurisdictional statutes of limitations are no longer relevant outside the context of administrative hearings. See *Litwiller*, 2011 IL App (4th) 100870, ¶ 17 (citing *Belleville Toyota*, 199 Ill. 2d at 338). Plaintiff, therefore, requested that the trial court find

4

that the filing date of the proposed amended complaint related-back to the date of filing of the original complaint pursuant to section 2-616(b) of the Code and grant her motion to reconsider the order of May 4, 2018, in which the trial court had denied her motion for leave to file an amended complaint.

¶ 10        In response, defendants reiterated the language of the Dramshop Act and argued that our supreme court's decision in *Demchuk* "merely reflect[ed] the explicit and clear text of the Illinois Dramshop Act." Defendants further contended plaintiff's cited authorities, including the Fourth District's decision in *Litwiller*, did not support plaintiff's contention that newly added plaintiffs could circumvent the one-year statute of limitations of the Dramshop Act. Defendant noted that, in *Litwiller*, the relation-back doctrine was applied to the dramshop claim to allow an amendment to correct the identity of the named defendant who had notice of the action (not to add new plaintiffs with new claims). Defendants contended, among other things, that the proposed loss of society claims in this case were new causes of action by new parties that were barred by the one-year limitation period set forth in the Dramshop Act. Defendant argued that, for those reasons, plaintiff's motion to reconsider should be denied.

¶ 11        In reply, plaintiff reiterated her argument that there was no exception to the relation-back doctrine for claims brought pursuant to the Dramshop Act. Plaintiff noted that the language of the relation-back statute in section 2-616(b) of the Code provided:

> "The cause of action *** set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted *** grew out

5

of the same transaction or occurrence set up in the original pleading ***." 735 ILCS 5/2-616(b) (West 2016).

Plaintiff contended that it was clear from the language of section 2-616(b) of the Code that the legislature intended for the relation-back doctrine to apply to all statutes, including the Dramshop Act. Additionally, plaintiff contended that the Fuller family was already a party to the current lawsuit "because they are members of Joshua Fuller's estate" and that being a member of Fuller's estate was enough to put defendants on notice of their existence as potential plaintiffs. Alternatively, plaintiff argued that Laura E. Fuller (Fuller's mother and the administratrix of Fuller's estate) was a "named party" in this case and should be allowed to bring a claim on behalf of herself and the entire Fuller family for loss of society.

¶ 12        At the hearing on plaintiff's motion to reconsider, plaintiff argued that the relation-back doctrine should be applied to allow plaintiff leave to amend the complaint to add the loss of society claims. In the alternative, plaintiff argued that she should be allowed to amend the prayer for relief of the original complaint to indicate that she was also seeking damages for loss of society. In response, defendant's attorney again noted the language of the Dramshop Act and argued that in adding a loss of society claim, "you have to join in that one year." Defendants' attorney noted that in *Litwiller* the Fourth District Appellate Court applied section 2-616(d) of the Code to allow an amendment to the complaint to relate back to the original filing date of the timely filed complaint for plaintiff to correct the identity of defendant, whereas, in this case, "they are trying to add plaintiffs and causes of action [pursuant to section 2-616(b) of the Code] that are completely untimely under the explicit law of the Dramshop Act." Defendants' counsel further noted that plaintiff, as the administratrix of Fuller's estate, was "standing in the shoes of

the decedent" to bring a dramshop claim for the bodily injury, medical expenses, and pain and suffering of the decedent and did not represent Fuller's family.

¶ 13       In ruling on plaintiff's motion to reconsider, the trial court indicated that it had previously ruled that "the attempt to add loss of consortium *** [was] a new cause of action" and nothing had changed since its ruling on May 4, 2018. The trial court indicated that it did not believe that it had misapprehended "the statute" (the Dramshop Act) or the decision of the Illinois Supreme Court in *Demchuk*, the Illinois Supreme Court's decision in *Demchuk* had not been overruled, and the legislature had not, in any way, amended "the statute." The trial court stated it had followed "the statute" and the Illinois Supreme Court on both the issue of relation back and the barring of a new action after one year. The trial court denied plaintiff's motion to reconsider.

¶ 14                           B. Motion for Summary Judgment

¶ 15       On July 23, 2018, defendants filed a motion for summary judgment. Defendants argued that summary judgment was appropriate due to (1) the lack of evidence that Nolan was intoxicated by alcohol at the time of the occurrence; (2) additionally and alternatively, Woppers, individually, argued that the negligible amount of alcohol served to Nolan at its establishment was insufficient to establish liability under the Dramshop Act; and (3) additionally and alternatively, Trojan's Corner argued summary judgment in its favor was appropriate due to a lack of evidence that Nolan was at Trojan's Corner on the night of the occurrence.

¶ 16       In support of their motion for summary judgment, defendants argued that Nolan had testified in his deposition that he was not intoxicated by alcohol at the time of the accident and that alcohol was not a factor in the motor vehicle accident. Defendants noted that Nolan was charged with, and subsequently pled guilty to, aggravated driving under the influence (DUI) for being under the influence of drugs (tetrahydrocannabinol (THC) and amphetamines), not for

7

being under the influence of alcohol, at the time of the accident. Defendants also noted that, in their depositions, various witnesses who had been present at Benny's Corner Bar in the hours prior to the incident—Tanya Oatman, Nikki Celia, and Kristin Taff—either could not provide an opinion as to whether Nolan was intoxicated or testified that Nolan did not appear to be intoxicated at Benny's Corner Bar (the first bar Nolan stopped at that night). Defendants additionally noted that Joshua Bateman, the bartender from Woppers (the last bar Nolan was at prior to the incident), testified in his deposition that Nolan did not appear intoxicated and had only consumed a partial can of beer at Woppers. Defendants further argued that witnesses who interacted with Nolan after the incident—Michael Wilson, Jarrod Martis, James Kosner, and William Zamaro—had testified that Nolan did not appear intoxicated. Defendants also noted that Cotyjo Milliman, who interacted with Nolan after the incident, could not provide an opinion as to whether Nolan was intoxicated. Defendants argued that there was, therefore, no evidence of Nolan's intoxication and summary judgment in their favor should be granted. In the alternative, Woppers, individually, argued that the only evidence regarding Nolan's alcohol consumption at its establishment was the testimony of Nolan and Bateman (the bartender) that Nolan had only consumed a partial can of beer. Woppers argued that, as a matter of law, it could not be held liable under the Dramshop Act for such a *de minimis* contribution to Nolan's alleged intoxication and, therefore, summary judgment in its favor should be granted. Additionally in the alternative, Trojan's Corner argued that summary judgment in its favor was appropriate due to a lack of evidence that Nolan had visited its establishment on the evening/morning at issue.

¶ 17 In response, plaintiff argued that (1) the trial court should deny Benny's Corner Bar and Wopper's motions for summary judgment because there was a genuine issue of material fact as to the number of alcoholic beverages consumed by Nolan at Benny's Corner Bar and at

Woppers, (2) the evidence of his alcohol consumption prior to the collision and the evidence of Nolan's behavior after the collision was sufficient to raise a genuine issue of material fact as to whether Nolan was intoxicated at the time of the collision, and (3) there was a genuine issue of material fact regarding the credibility of the witnesses upon whose testimony defendants relied to support their argument that Nolan was not intoxicated at the time of the incident. Plaintiff acknowledged a lack of evidence that Nolan had visited Trojan's Corner on the night of the occurrence and conceded that summary judgment in favor Trojan Corner was proper.

¶ 18    In support of defendants' motion for summary judgment and plaintiff's response thereto, the parties attached the deposition transcripts of various witnesses, court transcripts, summary reports of police interviews, and records of the state's attorney's office. At the hearing on the motion for summary judgment, the trial court noted it had read and reviewed all exhibits attached to the parties' motion or response thereto. The information contained therein is as follows.

¶ 19                                    i. Dillon Nolan

¶ 20    Nolan testified in his deposition taken in October 2016, that on April 14, 2015, around 6 p.m., he left work and went home.[1] Around 8 p.m. or 9 p.m., Nolan received a call from Fuller, who asked Nolan to meet him at Benny's Corner Bar. Nolan did not think that he consumed any alcohol prior to arriving at Benny's Corner Bar, but he could not really remember. Nolan testified that he had incurred a concussion in the accident, so everything was a "little bit fuzzy." Nolan testified that he did not consume any drugs prior to arriving at Benny's Corner Bar or at any time before the motor vehicle crash. Nolan stated, "[it] would have been a couple days before [that] I had the amphetamines, which was the Adderall."

---

[1]While the allegations of the complaint and deposition testimony of some witnesses referred to the relevant events as occurring on the evening of April 15, and into the morning of April 16, 2015, other witnesses referred to the relevant dates as April 14, into the early morning of April 15, 2015.

¶ 21　　　　Nolan "would probably assume" it was about 9 p.m. or 10 p.m. when he arrived at Benny's Corner Bar, but he did not know the exact time. When Nolan arrived, Fuller was already pretty drunk and was getting rowdy in the bar. Fuller also seemed preoccupied with the two women he was with, so Nolan left. Nolan believed he had only been at Benny's Corner Bar for a short amount of time and could not recall whether he drank a beer there. He further testified as follows:

> "I think we were there for such a short time. I'm not sure in my mind how that all played out, if, you know, I got there and realized that [Fuller] was too far past gone to even, you know, want to hang out. So then I just left, or if I stayed there for a little bit and then left. If I stayed there for a little while, then I probably had a beer or something like that. But if I did not, then I'm sure I didn't."

¶ 22　　　　About 15 minutes after leaving Benny's Corner Bar (in Farmington, Illinois), as he was driving home, Nolan received a call from Fuller, who indicated that he was at Elmwood Tap (in Elmwood, Illinois). Nolan met Fuller at Elmwood Tap about five minutes later. Nolan and Fuller stayed at Elmwood Tap for one or two hours. Nolan was not sure how much they drank at Elmwood Tap or if they even drank there at all. Nolan testified that he probably had purchased alcohol at Elmwood Tap because he "could not see [him]self sitting there for no reason," so he would assume he did. Nolan testified that he typically would be drinking Bud Light bottled beer if he was in a bar for one or two hours. He was sure that he probably had a drink at Elmwood Tap, but he could not say with 100% certainty. He was "[n]ot sure either way." After staying at Elmwood Tap for an hour or two, Nolan and Fuller walked to Woppers, the bar next door.

¶ 23　　　　When subsequently questioned by the attorney for Elmwood Tap during the deposition, Nolan testified that he did not recall for sure whether they had been at Elmwood Tap. He stated,

"[t]o my knowledge I thought that we were there, but I don't know. I don't know." Nolan agreed that he did not have a memory, one way or the other, as to whether he was at Elmwood Tap in the hours prior to the crash. Nolan also agreed that he had previously indicated he had been at three bars that night. He knew absolutely for sure that he had been at Benny's Corner Bar in Farmington that evening, and he thought he had been at two different bars in Elmwood that night.

¶ 24     Nolan testified that when he walked into Woppers, he ordered a beer. Almost immediately, another customer, Tim Carver, became belligerent and started yelling at Nolan for sitting in Carver's seat. Nolan and Fuller left Woppers because Nolan "didn't want any trouble out of the whole thing." Nolan testified that he and Fuller left Woppers within 10 minutes of arriving there, Nolan did not finish his beer, Nolan's beer was not empty when he left, and Nolan had consumed less than half of a beer at Woppers. When they left Woppers, Fuller got into Nolan's pickup truck, and then Nolan "burned rubber" (squealed his tires) and drove away. Nolan was driving to a 24-hour gas station in Brimfield to get cigarettes when his vehicle rolled over a few times at around 1 a.m.

¶ 25     Nolan further testified that he was "definitely going over the speed limit" by 5 or 10 miles per hour at the time of the crash. He believed his truck hit some gravel, and then he "over-corrected or something like that and just ended up flipping or rolling or whatever." He testified that he would attribute the accident to the road condition more than anything but also that he had "no clue" how the accident happened. He subsequently saw pictures of the road conditions at the time of the accident but did not remember "the whole gravel thing." He was told after the accident that the county had been doing road work in that area. Nolan testified that he typically drove 5 to 10 miles per hour over the speed limit and his speeding was not due to intoxication.

11

¶ 26     Nolan indicated he was 21 years old at the time of the accident. He testified that he was not buzzed or drunk at the time of the crash. He stated that consuming four beers in four hours was not enough alcohol to make him drunk. From prior experience, Nolan believed it would take 10 to 12 beers for him to become intoxicated. Nolan indicated that he could not recall many details regarding the night of the crash because he incurred blunt force trauma to his head in the crash and also because it had been two years since the crash. Nolan had not been previously deposed in this case due to pending criminal charges against him. Nolan indicated that he was not charged with DUI related to alcohol but, rather, for being under the influence of "THC and amphetamines."

¶ 27     Nolan testified that after the accident Fuller was not dead. He described Fuller as being "fine." Nolan testified that Fuller was able to walk and talk after the accident. Nolan had asked Fuller if he was all right, and Fuller had indicated that he was fine. Fuller helped Nolan to pick up pieces of Nolan's truck from the field after the crash. Nolan did not call 9-1-1 after the accident because he had previously been in a lot of accidents and, if nothing was wrong, he did not call the police. Nolan testified that it was "understood" that he and Fuller would not need to contact police because they had previously been in two accidents together, after which they had not called police. Nolan indicated that he had not called 9-1-1 in any accident that he had ever been in because "that's not how we did it out there." He stated, "[i]t's just I didn't know, I didn't realize it." Nolan did not know why he did not call his parents.

¶ 28     Nolan testified that after the accident, he called his best friend, Kosner, for help getting his truck towed away. Nolan also called Milliman to drive Nolan and Fuller to Wilson's house, where Fuller had been living. Milliman arrived about 10 or 15 minutes after Nolan had called him. Milliman first assisted Nolan with picking up stuff that was scattered in the field. Shortly

12

thereafter, Milliman, who was a medic in the Army National Guard, checked over Fuller. Milliman and Nolan asked Fuller if he needed to go to the hospital. Fuller said no. The three of them sat in the field and waited for Kosner to arrive. Nolan testified that he thought that Fuller had been "about passed out" at the time because Fuller had been so drunk prior to the crash. After Milliman arrived, Kosner and Martis arrived with a flatbed truck and skid steer. Nolan, Milliman, and Martis used the skid steer to load Nolan's truck on the back of the flatbed truck. At around 3 a.m., Milliman drove to Wilson's house with Nolan and Fuller riding in the bed of Milliman's pickup truck. Fuller was passed out at that time. Kosner and Martis also left the accident scene and dropped Nolan's truck off at Kosner's "shop."

¶ 29        According to Nolan, after a 10-minute drive from the accident scene, Nolan, Fuller, and Milliman arrived at Wilson's home. Wilson lived with his brother, Zamaro. Nolan had not called Wilson or Zamaro prior to arriving at their home. When they arrived, Fuller was coherent but could not walk well. Milliman and either Wilson or Zamaro carried Fuller inside and sat him on the couch. Nolan did not assist because he had injured his shoulder in the crash. Milliman went home about 5 or 10 minutes after getting Fuller inside. As Nolan was speaking with Wilson and Zamaro, Fuller rolled off the couch. Fuller then slept on the floor. After taking a shower, Nolan went to sleep on the couch. At 7 a.m. or 8 a.m., Zamaro woke Nolan and indicated that Fuller was not breathing. Zamaro went to get a neighbor (a hospital employee) to check Fuller's condition. Nolan waited outside, and Wilson called 9-1-1. When the ambulance arrived, Nolan informed the medics of the rollover crash. Nolan was taken to the hospital in an ambulance and was given a blood test, which showed a blood alcohol content of zero.

¶ 30        Nolan testified in his deposition that he was only certain that he had a half of a beer at Woppers the entire night. He did not know whether he had any beer at Benny's Corner Bar, but

13

he did not believe that he did. Nolan thought that he had left Benny's Corner Bar "pretty quick because of the way [Fuller] way acting," but he was not sure. Nolan was shown a copy of a summary of a statement he had given to police on the day of, or the day after, the crash, in which Nolan indicated that he had a couple of beers at "the Corner Tap" (Benny's Corner Bar) but did not have any when he went to Woppers to pick up Fuller. In his deposition, Nolan then testified that he could have had drinks at the Corner Tap (Benny's Corner Bar), but he did not know. Nolan stated that he did not remember a whole lot about that night.

¶ 31     A police report indicated that Nolan was taken to the hospital by ambulance and arrived around 10:30 a.m. on the morning of the incident. The results of a blood draw indicated that Nolan had THC and amphetamines (but no alcohol) in his system. A police report also indicated that Nolan told police he had smoked marijuana two days prior and that the accident occurred when his tire blew out, he lost control of his vehicle, and his vehicle hit a ditch and landed on its top. Nolan had indicated to police that he and Fuller had gotten out of the vehicle and were walking around, but Fuller did not help to load Nolan's vehicle on the flatbed truck because Fuller was not feeling well and was sitting on the ground. Nolan was arrested for DUI related to THC (marijuana use).

¶ 32     Police reports also indicated that when investigating the incident at Wilson's apartment, the Fulton County Coroner had indicated he did not believe that Fuller died at the apartment. The coroner showed officers injuries on Fuller that should have been bleeding if Fuller was alive at the apartment. The coroner also rolled over Fuller's body and showed officers that there was no blood on the carpet under Fuller's body, which indicated Fuller's body had been placed at that location postmortem.

14

¶ 33     Nolan testified in his deposition that he had pled guilty to aggravated DUI (related to being under the influence of drugs) and leaving the scene of an accident involving great bodily harm or death.

¶ 34                                   ii. Kristin Taff

¶ 35     Taff testified in her deposition taken in July 2018 that she was at Benny's Corner Bar with Nolan and Fuller in the hours prior to the motor vehicle crash. She arrived around 7 p.m. with her friend Oatman. Fuller was already at the bar. Nolan arrived at some point between 9 p.m. and 10 p.m. but definitely before 10 p.m. Taff, Nolan, and Fuller played a few rounds of pool, with each round taking 20 minutes. Taff knew Nolan had consumed at least four beers because the group had bought five rounds of drinks. She did not actually see whether Nolan had finished the fifth beer because she left before he did. According to Taff, Nolan had also gone up to the bar on his own at times, but she could not be certain if he had purchased additional alcoholic beverages for himself. Fuller and Nolan were still at Benny's Corner Bar when Taff and Oatman left around 11 p.m. or 11:30 p.m.

¶ 36     Taff testified that she drank at least six beers that evening and had a "buzz." She also testified that Nolan did not appear drunk and the beers he had consumed were spread out over the course of the time that he was at the bar.

¶ 37     Taff indicated that she knew lawsuits related to Fuller's death had been filed because Fuller's sisters had posted the outcome of what had happened in court on social media. In response to this testimony by Taff, defendants' attorneys stated, "I am going to make a formal request that that be preserved, families in the estate, just—."

¶ 38                                   iii. Tanya Oatman

15

¶ 39        Oatman testified in her deposition that she arrived at Benny's Corner Bar on the evening in question around 6 p.m. Oatman and Taff left around 10:30 p.m. or 11 p.m., before Nolan and Fuller left. Oatman had never met Nolan prior to that evening. Oatman did not interact with Nolan and did not play pool with Taff, Nolan, and Fuller. Instead, she was at the other end of the bar with her group of friends. When Oatman went to get Taff from the other side of the bar so they could leave, Oatman saw that Nolan and Fuller "had mugs of beer." She exchanged "a general hi, bye" with Nolan. Nolan did not appear to be drunk.

¶ 40                              iv. Nikki Celia

¶ 41        Celia testified in her deposition that on the evening in question, she and Fuller were hanging out at Benny's Corner Bar (in Farmington, Illinois). At some point, Celia left and went to another establishment down the road but returned later. She did not know if Nolan was at Benny's Corner Bar during the time that she had left. When she returned, Fuller indicated that Nolan was coming to get him and they were going to Woppers (in Elmwood, Illinois) to continue drinking. While Celia was sitting at the bar with Fuller, Nolan entered and sat next to Fuller. Fuller asked Celia to "go out drinking" with them, but she declined. Fuller and Nolan left Benny's Corner Bar about 30 minutes after Nolan had arrived, around 11:30 p.m. or midnight. Celia did not pay attention to whether Nolan had been drinking and had no idea whether Nolan consumed 1 beer or 10 beers. She had no opinion as to whether Nolan showed any signs of intoxication and was not able to say whether Nolan showed signs of intoxication.

¶ 42                              v. Joshua Bateman

¶ 43        On April 21, 2015, a few days after the incident, the bartender from Woppers, Bateman, gave a statement to police indicating that Nolan had come into Woppers a little after 1 a.m. and ordered a beer. After 5 to 10 minutes, Fuller came in through the back door. During the time

16

Nolan was waiting for Fuller to arrive, another patron, Carver, was "trying to start s*** with [Nolan] for no reason." Nolan said he was leaving and walked out the front door. Fuller also went out the front door and got into Nolan's truck. Nolan squealed the tires of his truck as he drove off. Bateman indicated that Nolan may have had "maybe one or two" beers at Woppers, with him being certain that he served Nolan a beer. According to Bateman, Nolan did not look drunk when he came in, whereas Fuller looked like he had been drinking. Bateman was asked, "so you served one or two beers to Nolan at about what time?" Bateman responded that it had been around 1:15 a.m. or 1:20 a.m. and that Nolan and Fuller subsequently left Woppers about 1:30 or 1:40 a.m.

¶ 44    In April 2017, in his discovery deposition two years after the incident, Bateman testified that on the night/morning in question, around midnight, Nolan parked in front of Woppers and came into the bar. Nolan did not appear drunk. He was not stumbling or slurring his speech and did not have red eyes. Nolan ordered two Busch Light beers and told Bateman that one beer was for Fuller who was coming from the bar next door (Elmwood Tap). Fuller arrived 5 to 10 minutes later and appeared to be drunk. Nolan sat down and put his foot up on a chair, which was the chair in front of which Carver had placed his drink. Carver came out of the bathroom and "was like, '[h]ey, man, I'm sitting here. What's going on? What is this?' Blah, blah, blah." Nolan and Carver "started going back and forth disagreeing," but then shook hands and everything was okay. Fuller came in through the back door of Woppers, grabbed a beer, and went out front to smoke. Nolan and Carver began arguing again, and then Nolan got up and said, " 'I'm not dealing with this. I'm here to have a good time.' " Nolan walked out the front door and got in his truck. Fuller came in through the front door and asked Carver, " '[h]ey why are you messing with my buddy? We're just here to have a good time.' " Then Fuller walked out.

17

Nolan "burned rubber and left." Bateman testified that it seemed that Carver had started the argument with Nolan. Nolan and Fuller were at Woppers for approximately 20 minutes. Bateman recalled having to pour out a portion of Nolan's leftover beer. Bateman had no doubt there had been some beer left in Nolan's can. Defendants' attorney asked, "[a]re you able to say if it was half a can? Less than half a can? More than half a can? Do you have any idea?" Bateman replied, "[l]ess than half a can." Bateman testified that Nolan did not seem to be intoxicated when he left Woppers. At the time of his deposition, Bateman was no longer working at Woppers.

¶ 45                     vi. Cotyjo Milliman

¶ 46        According to a police report, on the morning of the incident, Milliman told police that he and Zamaro had carried Fuller into Wilson's residenc, and, at that time, Fuller was highly intoxicated and injured but was alive. Milliman told police that Fuller had been giving one-word answers to questions he asked. After bringing Fuller inside, Milliman went home. Milliman told police that he could smell an odor of alcoholic beverage coming from Nolan, but Milliman could not say whether Nolan was intoxicated or not.

¶ 47        In a deposition in September 2017, over two years later, Milliman testified that Nolan had called him between 1 a.m. and 1:30 a.m. on the morning of the motor vehicle crash. Nolan seemed calm and clear on the phone. Nolan told Milliman that he had put his truck in a ditch and needed it to be pulled out. When Milliman told Nolan to call 9-1-1, Nolan hung up on him but then called Milliman back about 10 minutes later. Milliman met Nolan's other friends, Kosner and Martis, at a gas station so they could follow Milliman to the crash site. Almost one hour after receiving the initial call from Nolan, Milliman arrived at the accident scene. Milliman did not know one way or another if Nolan was intoxicated, but Nolan did not appear to be drunk. Milliman did not observe Nolan slurring his speech, spitting, or having bloodshot eyes. Milliman

18

testified that Nolan's truck was completely upside down. Fuller was lying on the ground and was not moving. Milliman suggested that Nolan call 9-1-1, but Nolan said that Fuller was okay and was just intoxicated. Milliman thought it was odd not to call police and thought that maybe Nolan was worried that he and Fuller would be in trouble for anything that they might have done that night. According to Milliman, Fuller had a heartbeat and spoke. Milliman and Nolan lifted Fuller and placed him into the bed of Milliman's pickup truck. Milliman drove Nolan and Fuller to Wilson's home. Milliman backed his truck up to the door of Wilson's house. Fuller was removed from the truck and laid on the floor inside Wilson's house. Fuller was not talking.

¶ 48    During the deposition, Milliman testified he had observed a lot of beer cans inside Nolan's truck at the accident scene but then clarified that he had seen a lot of beers cans in the field. Milliman reiterated that he did not observe Nolan displaying any signs of intoxication and indicated that he had no reason to believe that Nolan was intoxicated. Milliman indicated that he and Nolan were close childhood friends and had gone to school together from eighth grade until their high school graduation in 2012. Milliman had seen Nolan become intoxicated in the past after drinking six to seven beers in a short amount of time, one right after another ("slamming" beers). After high school, Milliman served in the Army National Guard from 2012 until 2017. As a result of his involvement in this incident, Milliman was demoted.

¶ 49                                vii. James Kosner

¶ 50    According to a police report taken on April 16, 2015, Kosner told police that Nolan had contacted him after the crash and had asked if he would be interested in a wrecked truck for parts. Kosner instructed Nolan to leave his truck near Kosner's shop. Kosner denied picking up the truck and taking it to his shop. Kosner told police that when he arrived at work that morning, he noticed Nolan's truck and did not know how it had gotten there. Kosner was again

19

interviewed by police later in the day on April 16, 2015, and again on April 20, 2015, and admitted that he had lied during the initial questioning. Kosner told police that at 1:30 a.m. on April 16, 2015, Nolan called him, indicated that he had been in a wreck, and asked Kosner to bring a skid loader and trailer to the accident scene. Nolan did not inform Kosner that Fuller was also involved in the accident. At the accident scene, Kosner and Martis loaded Nolan's truck onto Kosner's trailer and took it away. Kosner had not spoken with Milliman, only briefly spoke with Nolan, and never saw Fuller. Kosner told police that he initially lied because he was scared and did not want his equipment to be impounded. Kosner was arrested for obstruction of justice.

¶ 51    In September 2017, at his deposition over two year later, Kosner testified that Nolan had called him and indicated that he had been in an accident and needed Kosner to pick up his wrecked vehicle. Kosner's cell phone records showed that Kosner missed a call from Nolan at 1:13 a.m. and engaged in a 1½-minute conversation with Nolan at 1:21 a.m. Kosner received another call from Nolan at 1:27 a.m., during which Nolan told Kosner that Milliman would be meeting up with Kosner at a gas station to show him the way to the accident scene. Martis accompanied Kosner to the accident scene. They first drove to pick up some equipment to tow Nolan's wrecked vehicle and then met Milliman at a gas station. At the accident scene, Kosner interacted with Nolan for less than 10 minutes. Nolan did not appear intoxicated, and Nolan did not slur his speech or stumble. Kosner had no interaction with Fuller.

¶ 52                                    viii. Jarrod Martis

¶ 53    Martis testified that he rode out to the accident scene with Kosner in Kosner's pickup truck. At the accident scene, Martis saw Nolan's crashed vehicle in a ditch. It took them about an hour to complete the job of towing it away. Martis had interacted with Nolan very briefly, and Nolan did not appear to be intoxicated or show signs of intoxication. Martis never saw Fuller.

20

¶ 54                                     ix. Michael Wilson

¶ 55        According to a police report, after responding to Wilson and Zamaro's home on April 16,

2015, and while transporting Wilson and Zamaro to the sheriff's office for questioning, Wilson

told police (1) Nolan had told Wilson that he wrecked his truck and had to pull Fuller from the

wrecked vehicle; (2) Fuller was conscious and had walked into Wilson's house; (3) Wilson asked

whether Fuller or Nolan wanted to go the hospital and they both refused; (4) Wilson had offered

Fuller a drink and Fuller declined it; (5) Fuller went to sleep on the floor; (6) Nolan took a

shower; (7) Wilson gave Nolan clothes to wear; (8) when Wilson went back to sleep, he heard

Fuller snoring; and (9) Wilson and Zamaro had to be up at 7:30 a.m. for work, at which time they

noticed Fuller's condition and went to get their neighbor.

¶ 56        In September 2017, at a deposition over two years later, Wilson testified on the morning

of the incident, he woke up to commotion in his home around 4 a.m. and saw Fuller on the floor,

breathing heavily, and "making crazy noises." Wilson asked Nolan why Fuller was breathing

that way, and Nolan said that Fuller was fine and that he had checked Fuller's rib cage, and

everything was "in place." According to Wilson, Fuller was twitching. Wilson did not call 9-1-1

because did not know the severity of Fuller's injuries due to Nolan and Milliman lying to him.

Wilson testified that Nolan and Milliman "collaborated" and gave him "the most bulls*** story

[he had] ever heard in his life," telling him Nolan had wrecked his truck after one of his tires

blew out and the truck went into the ditch. They did not tell Wilson that Nolan's truck had rolled

over or that Fuller had been ejected from the vehicle. Wilson testified that Nolan did not appear

intoxicated and did not smell like alcohol when he arrived at Wilson's home. Nolan had

indicated that he had one or two beers at the bar and that was it.

¶ 57     During his deposition, Wilson also testified that he had asked Fuller if he wanted to go to the hospital and Fuller had said no. He had no other conversation with Fuller. Wilson testified that he was, however, distracted from Fuller's condition due to Nolan's condition because Nolan had "blood all over his face."Wilson fell back asleep after listening to Fuller making "noises" until about 5:30 a.m. A few hours later, when Wilson was on his way out the door to go to work at 7:30 a.m. or 8:30 a.m., he noticed that Fuller was not breathing. He checked Fuller for a pulse because Fuller was "abnormally pale," and Fuller had no pulse. Wilson told his neighbor, who called 9-1-1, while Wilson and Zamaro cleared the house of drugs. Wilson gave Zamaro some drug paraphernalia to discard, which Zamaro took to the country and "ditched." Wilson testified that Fuller was alive when Nolan and Milliman brought Fuller into the house.

¶ 58     Wilson was charged with obstruction of justice for lying to police regarding whether Fuller was alive when Fuller was brought into Wilson's home and for giving a false statement to police in an attempt to aid Nolan in a cover up. Following a bench trial, Wilson was found guilty of felony obstruction of justice.

¶ 59                           x. William Zamaro

¶ 60     According to a police report, police were called to Wilson and Zamaro's home at 9:14 a.m. on April 16, 2015. At 9:45 a.m., Zamaro drove up to the home and told police officers that he had gone out to get cigarettes due to the stressful situation.

¶ 61     Two years later, in April 2017, Zamaro testified in a deposition that at the time of the accident, he and his brother, Wilson, lived together in a house in Farmington, Illinois, and Fuller was staying with them. At 4 a.m. or 5 a.m. on the morning of the crash, Zamaro was sleeping when Nolan knocked on the door and indicated there had been a motor vehicle accident. Nolan had blood on his face and mentioned having had hurt his shoulder. Nolan did not appear drunk,

22

and Zamaro did not believe that Nolan was intoxicated. Nolan was not stumbling or slurring his speech. Fuller was laying in the back of a pickup truck. Zamaro did not want to comment in the deposition as to whether Fuller was alive at that time because "last time [he] did that, [he] went to jail." Zamaro explained he had been charged with, and pled guilty to, felony obstruction of justice related to this incident.

¶ 62    Unrelated to Fuller's condition, Zamaro additionally testified that Nolan indicated that he and Fuller were coming from Burnzee's, a bar in Brimfield, when the accident occurred. Zamaro indicated that the road where the accident occurred would be one way to get from Brimfield to his home in Farmington and it would not have made sense to take that route if coming directly from Woppers in Elmwood. Nolan told Zamaro he had been drinking that night, that he had picked up Fuller because Fuller was too drunk to drive, Nolan and Fuller drank together, and they got into a wreck. Milliman had told Zamaro that Nolan's tire blew out and Nolan's vehicle hit a ditch. Zamaro had asked Nolan if they should call 9-1-1 or an ambulance, and Nolan said he thought they were all right. Nolan indicated that he hit his face on the steering wheel. The remainder of Zamaro's deposition was suspended due to Zamaro asserting his fifth amendment rights in relation to questions regarding Fuller's condition upon arriving at Zamaro's house.

¶ 63    A few months later, in September 2017, the second half of Zamaro's deposition took place. Zamaro testified that on the morning of the incident at around 3 a.m., he heard his brother's phone ringing in the other room. Both Zamaro and Wilson were sleeping and did not answer Wilson's phone. About 30 or 40 minutes later, Zamaro heard banging on the back door. Nolan was at the door and indicated that he had been in a wreck. Milliman explained that Nolan had gotten into a wreck with Fuller in the passenger seat after Nolan's tire blew out and they hit a ditch. Zamaro asked if Fuller was injured. Either Nolan or Milliman had indicated that they did

23

not believe Fuller was injured. They all went to Milliman's pickup truck. Fuller was laying in the bed of the truck and appeared to be sleeping. Nolan told Zamaro that when he and Fuller had left Burnzee's Bar and Grill, Fuller was extremely intoxicated, Fuller was unable to stand, and Nolan had to load Fuller into the cab of his truck. Zamaro testified that Fuller appeared to be breathing because he could see the movement of Fuller's chest rise. Zamaro had shaken Fuller on the shoulder to try to wake him, and Fuller moved his upper body slightly, shook his head a little, and made some grunting noises, "[b]ut that was about it." Zamaro testified, "[h]e moved of his own free will. He was breathing. He was alive." Zamaro and Milliman lifted Fuller out of the truck and carried him into the house and laid him on the floor. They did not lay Fuller on the couch at any point. Fuller did not speak any coherent words. He just made noises, like groans. Fuller did not stand up. Zamaro testified that when Fuller was laying down, Fuller moved his arms and head. Wilson had woken up about the time that Zamaro and Milliman were carrying Fuller into the house and asked what had happened. They all had a conversation about calling 9-1-1, and Nolan persuaded them that it was not necessary. Zamaro was concerned that Fuller needed medical attention but did not know why he did not call 9-1-1, noting that he had been woken up at 4 a.m. and did not know how to handle the situation. Zamaro had asked Nolan if Fuller was okay and whether they needed to call an ambulance. Nolan said no and that the accident was no big deal and he had just gone into a ditch. Zamaro asked what if Fuller had cracked a rib and had internal injuries. Zamaro testified, "[i]n my ignorance in the moment, I believed Dillon Nolan when he told me I checked his ribs. They're not broken." Nolan had indicated that he had picked up Fuller from Elmwood because Fuller was too drunk to drive but also indicated that they went to Burnzee's afterward and had some drinks. Zamaro stated that Nolan did not appear to be intoxicated. Zamaro had not been aware that the wreck occurred three

24

hours prior to the time Nolan had come to his house. Zamaro did not know whether Nolan was intoxicated at the time of the crash.

¶ 64 Zamaro additionally testified that Milliman left shortly after they brought Fuller inside. Nolan then took a shower. About 30 minutes to an hour after bringing Fuller inside, they all went to sleep. Fuller was snoring, so it was difficult for Zamaro to go back to sleep. Initially, Zamaro had laid back down at 4:20 a.m., but he got up 10 minutes later to see who was snoring. Wilson also came into the living room. Fuller was snoring, and Nolan was sitting on the couch. Zamaro and Wilson had a "slight discussion" about Fuller snoring so loud and that it had already been a "crazy night," they did not know what to do, and that Fuller snored in the past "so it was semi-normal." They returned to their rooms and tried to sleep through it. Zamaro woke up at 9 a.m. and started getting ready for work. About 10 or 15 minutes later, Wilson called Zamaro into the living room and indicated that he did not think Fuller was okay. Zamaro grabbed Fuller's wrist to check for a pulse. There was no pulse and Fuller's wrist was cold. Zamaro went to the neighbor's house because he did not know what to do and because he considered the neighbors good friends and "actual adults." Zamaro believed that he told the neighbors that Fuller was dead and to call 9-1-1. Shortly thereafter, police officers arrived. Prior to the police arriving, Zamaro left and went on a back road to throw some pills out that he had in his room. Although he told police that he had left to go get cigarettes, he was actually getting rid of controlled substances.

¶ 65 In his deposition, Zamaro acknowledged that he had pled guilty to obstruction of justice related to lying about Fuller's condition. Zamaro explained that he had pled guilty because his brother (Wilson) had previously been found guilty of the same charge after a bench trial and because he had three pending felony charges related to possession of heroin.

¶ 66                          xi. Dr. Scott Denton

25

¶ 67        On March 28, 2016, Dr. Scott Denton testified as an expert witness in forensic pathology at Wilson's bench trial. Denton testified that he had been a forensic pathologist for almost 20 years and was employed by coroners in central Illinois to perform autopsies. Denton testified that he had performed an autopsy on Fuller. Fuller had the following external injuries: scrapes or abrasions on the right side of his face, chest, and abdomen; a dislocated right arm, with his right hand positioned above his head (Denton opined Fuller's right arm had been dislocated and fixed in that position, either from trauma or from the pulling of his arm upwards); numerous broken ribs; mud within Fuller's nose, over his teeth, within his mouth, and within his right ear; and his right ear was caked with blood. Fuller also had the following internal injuries: a large, six to seven inch bruise on the left side of Fuller's head, beneath the scalp over the skull, indicating a substantial impact to the left side of Fuller's head; contusions on the temporal lobes of his brain; bruising in the central part of the brain, indicating trauma to the internal part of the brain; bilateral fractures of the ribs; some internal bleeding associated with the tearing of the ribs; a collapsed right lung (deflated because of tears); and a four-inch tear in the chest wall. Denton testified that there was no bleeding associated with the chest tear. He stated that if someone had been alive after sustaining such a tear, he would expect the chest cavity to fill with blood. There was, however, a tear in the chest wall with no bleeding, indicating that within minutes of sustaining those injuries Fuller's blood pressure "went to basically nothing very quickly because if he still had blood pressure and his heart was still pumping, those injuries should have filled up his chest wall with blood." The fact that there was no bleeding into the chest cavity was an indication that Fuller had died very rapidly after that tear. Denton further testified that Fuller suffered a severe fracture of his back and Fuller's spinal cord was severely bruised. There was blood around the spinal cord. There was also bleeding inside the spinal cord, indicating no

26

electrical signals below that area. Denton also testified that Fuller's brain was "very swollen" from lack of oxygen and blunt trauma.

¶ 68        Additionally at Wilson's bench trial, Denton had opined that Fuller died from multiple blunt injuries of the head and chest due to a severe motor vehicle collision type trauma. He also opined that after receiving those injuries, Fuller would have lived for "minutes." When asked whether Fuller could have been walking around after receiving those injuries, Denton testified that based on the spinal cord injury, Fuller would have been paralyzed from the mid-chest area and down. He stated, "so I do not believe he would be walking, no." Denton further opined that Fuller would not have been able to sit upright on the couch on his own (without being balanced in an upright position). Denton testified that based on Fuller's collapsed lung and brain injuries, which would have caused the brain to start swelling immediately, Fuller would not have been able to communicate coherently. Denton opined that it was possible for Fuller to have had a "lucid interval" after incurring the injuries "but not for any significant time beyond a minute or two." Denton testified that if Fuller was still alive after sustaining the indicated injuries, he was likely unconscious. Denton explained that Fuller's brain was severely swollen and, "when that occurs, he'll be unconscious." Denton also noted there had been "deep bruising to [Fuller's] brain" and opined that Fuller would have been conscious "for a very, very short period of time if at all," meaning a few minutes at the most. He acknowledged that Fuller could have been making sounds, even if unconscious. He testified that even if Fuller had been alive and conscious after the collision, Fuller would not have been coherent. Denton, opined, however, that Fuller was likely unconscious after sustaining the injuries. Denton noted that the lack of bleeding from the tear in the lung and chest wall indicated that Fuller had no blood pressure after incurring those injuries, which indicated "the person died very rapidly."

¶ 69      In September 2017, in a discovery deposition in this case, Denton testified that Fuller died from multiple blunt injuries to the head and chest. Fuller also had severe injuries of his brain, lungs, spine, and spinal cord. Denton stated, "[Fuller's] lungs were torn, so he basically just died very rapidly after the impact from the crash." He explained that when the lung tissue is torn, the lungs "immediately bleed and will fill the chest cavity with something called a hemothorax or blood." Denton testified that when the tear occurred to Fuller's right lung, Fuller had no blood pressure (his heart was not pumping). Fuller's liver also had a tear, and liver lacerations typically "bleed profusely," but there had been no bleeding into Fuller's abdomen. Fuller's right lung was collapsed and his ribs were fractured (second through eighth ribs, bilaterally), which indicated that Fuller would not have been able to breathe for very long, if he was breathing at all. Denton indicated that a person would die within minutes after such an injury if they did not have emergency resuscitation right away. Denton testified that Fuller's injuries included: bleeding over the spinal cord; a fracture of his sixth and seventh vertebral body (thoracic spine fracture) and spinal cord injury (at the mid-chest level) that would have caused paralysis from the mid-chest down, which would have been extremely painful; bruising of the brain; and hemorrhaging in areas of the brain. Denton testified that Fuller's brain injury was so severe that it went "all of the way through the scalp, the skull, and penetrate[d] into the deeper part of the brain, this blunt trauma." He stated, "[s]o the person will be unconscious after they sustain that severe blunt trauma to the center of their brain." Denton testified that another indication that Fuller died shortly after the accident was that there was still mud and dirt in Fuller's teeth and nose at the time of the autopsy. Denton also noted that Fuller should have been bleeding from the external lacerations if he had been alive after the accident, "especially on the face like at the right ear." There having been no blood on the carpet where Fuller was found

28

would be consistent with Denton's opinion that Fuller had died at the scene of the collision rather than at Wilson and Zamaro's house.

¶ 70    In his deposition, Denton reiterated that his cause of death opinion in this case was that Fuller died from multiple blunt injuries to the head and chest due to the motor vehicle crash and that, due to the severity and extent of his injuries, Fuller would have been paralyzed from the mid-chest down, Fuller was likely unconscious after the crash, and Fuller would have died within minutes of the crash. Denton testified that Fuller's injuries were consistent with being ejected from the vehicle. Based on Fuller's brain injury, Denton opined that Fuller would have been instantaneously unconscious at the time of the trauma to his head.

¶ 71    C. Hearing on Motion for Summary Judgment

¶ 72    At the hearing on defendant's motion for summary judgment, defendant's attorney argued that there was no evidence that Nolan was intoxicated at the time of the motor vehicle crash and that anything that occurred after the crash was irrelevant. Plaintiff's counsel conceded "not one witness testified that [Nolan] was intoxicated." However, plaintiff's counsel argued there was an issue of fact as to whether Nolan was intoxicated at the time of the crash where the evidence showed Nolan had at least two to six drinks at Benny's Corner Bar, went other places before going to Woppers, had one to two more drinks at Woppers, and displayed "extremely unusual behavior" following the crash, including not calling police or an ambulance, not taking Fuller to the hospital, and having friends move his wrecked vehicle away from the accident site.

¶ 73    The trial court found there was no evidence of "observation of intoxication or even evidence of intoxication from an excessive amount of drinking." The trial court additionally found that there was no caselaw to support plaintiff's argument that the coverup of the accident was indicative of unusual behavior showing Nolan's intoxication. The trial court granted

29

defendants' motion for summary judgment, finding there was no issue of material fact in dispute. In its written order, the trial court indicated that defendants' motion for summary judgment was granted for the reasons stated on the record and that it adopted defendants' briefing and oral arguments on the motion.

¶ 74　　Plaintiff appealed the trial court's order of October 10, 2018, denying her motion for the trial court to reconsider its order of May 4, 2018, in which the trial court denied her motion for leave to file a first amended complaint. Plaintiff also appealed the court's grant of summary judgment in favor of Benny's Corner Bar and Woppers. (As noted above, plaintiff had conceded that summary judgment in favor of Trojan's Corner was proper).

¶ 75　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 76　　On appeal, plaintiff, the administratrix of Fuller's estate, argues: (1) her motion for leave to amend the complaint to add dramshop claims for loss of society by Fuller's family members should have been allowed and the filing date related back to the filing date of the original complaint pursuant to section 2-616(b) of the Code; and (2) the trial court erred by granting the defendants' motion for summary judgment where there was a material issue of fact regarding Nolan's intoxication at the time of the occurrence. In response, defendants argue the trial court's denial of plaintiff's motion for leave to file an amended complaint was proper. Defendants also argue the granting of their motion for summary judgment should be upheld because the record is devoid of evidence that Nolan was intoxicated.

¶ 77　　　　　　　　　　　　A. Motion to Amend the Complaint

¶ 78　　Plaintiff argues the trial court erred by denying her motion for leave to file a first amended complaint to add the loss of society claims by Fuller's family members. Plaintiff contends that in doing so, the trial court erroneously relied on our supreme court's decision in

30

*Demchuk*, in which our supreme court affirmed the dismissal of dramshop claims brought by minor children beyond the one-year limitation period after concluding that the Dramshop Act's one-year limitation was a special limitation applicable to minors that could not be tolled. *Demchuk*, 92 Ill. 2d at 6-9. Plaintiff argues that, subsequent to *Demchuk*, our supreme court in *Belleville* denounced "condition precedents," so that the one-year limitation in the Dramshop Act "cannot stand as a condition precedent which precludes the [circuit] court from exercising its jurisdiction." In response, defendant argues that denial of plaintiff's motion for leave to amend the complaint to add additional plaintiffs and causes of actions was proper where the denial was within the trial court's discretion and where plaintiff's attempt to add additional plaintiffs and causes of action was time-barred under the Dramshop Act.

¶ 79    A cause of action brought pursuant to the Dramshop Act "shall be barred unless commenced within one year next after the cause of action accrued." 235 ILCS 5/6-21(a) (West 2014). Our supreme court has stated that "the special one-year limitation in the Dramshop Act is a condition precedent to the right of recovery which must be observed by all plaintiffs in order to bring themselves within the Act." *Demchuk*, 92 Ill. 2d at 9.

¶ 80    In *Demchuk*, two consolidated cases on appeal involved the issue of "the special one-year limitation contained in the Dramshop Act" and its applicability to minors. *Id.* at 3. The Illinois Supreme Court in *Demchuk* noted that the Dramshop Act had contained its own "special limitation" since 1949 and indicated that it had previously held that the one-year limitation was a special limitation upon a statutory cause of action. *Id.* at 5-7 (citing *Lowrey v. Malkowski*, 20 Ill. 2d 280, 283-85 (1960) (holding that based on the plain language of the Dramshop Act and the "evident purpose of the limitation," the action involving minor plaintiffs was required to be filed within one year after the cause of action accrued)). Our supreme court in *Demchuk*

31

acknowledged the well-recognized rule that "a special limitation in a purely statutory cause of action, unlike a general statute of limitations, operates as a limitation of the liability itself and not the remedy alone." *Id.* at 6. The *Demchuk* court further indicated that a special limitation in a statutory cause of action "is a condition attached to the right to bring the action, and plaintiffs must allege or state facts showing that the action is brought within the time prescribed or they have failed to bring themselves within the compass of the Act." *Id.* at 6-7. The Illinois Supreme Court in *Demchuk*, therefore, held "the special one-year limitation in the Dramshop Act is a condition precedent to the right of recovery which must be observed by all plaintiffs in order to bring themselves within the Act." *Id.* at 9 (holding the Dramshop Act does not provide for tolling for disabilities such as minority or incompetency).

¶ 81    In *Belleville Toyota*, on appeal from a multi-million-dollar judgment against defendants for violating the Motor Vehicle Franchise Act (815 ILCS 710/1 *et seq.* (West 2000)), defendants argued that because the plaintiff had failed to comply with the four-year limitations period in that statute, the claim was extinguished. *Belleville Toyota*, 199 Ill. 2d at 333. The defendants contended that compliance with the limitations period was an element of the plaintiff's case and a jurisdictional prerequisite. *Id.* The plaintiffs argued the limitations period contained in that act was an ordinary statute of limitation and was not a jurisdictional prerequisite to suit. *Id.*

¶ 82    In first addressing the defendant's argument related to the subject matter jurisdiction of the circuit court, our supreme court in *Belleville Toyota* stated, "[w]ith the exception of the circuit court's power to review administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is conferred entirely by our state constitution." *Id.* at 333-34 (citing Ill. Const. 1970, art. VI, § 9). "[E]xcept in the area of administrative review, the jurisdiction of the circuit court flows from the constitution." (Emphasis in original.) *Id.* at 334-35

32

(citing Ill. Const. 1970, art. VI, § 9). The Illinois Supreme Court noted that under our former constitution, adopted in 1870, the circuit court had original jurisdiction of "all causes in law and equity" but its jurisdiction over special statutory proceedings was derived from the legislature so a court lacked jurisdiction unless the statutory requirements for the cause of action were satisfied. (Internal quotation marks omitted.) *Id.* at 336-37. Under the new judicial article effective in 1964 (amending the 1870 constitution), which was retained in the current Illinois constitution adopted in 1970, the circuit court had " 'original jurisdiction of all justiciable matters, and such powers of review of administrative action as may be provided by law.' " *Id.* at 337 (quoting Ill. Const. 1870, art. VI (amended 1964), § 9). Our supreme court stated that considering these changes, the precedential value of case law that had examined a court's jurisdiction under the pre-1964 judicial system was "limited to the constitutional context in which those cases arose." *Id.* at 336-37. The Illinois Supreme Court determined defendants' jurisdictional argument relied on a rule of law that was rooted in the pre-1964 judicial system, with the rule being that

> "a limitations period contained in a statute that creates a substantive right unknown to the common law, and in which time is made an inherent element of the right, is more than an ordinary statute of limitations; it is a condition of the liability itself and goes to the subject matter jurisdiction of the court." *Id.* at 338.

The supreme court stated, "[t]o the extent this proposition has any relevance today, it is confined to the area of administrative review—the only area in which the legislature still determines the extent of the circuit court's jurisdiction." *Id.* Noting that the claim in *Belleville Toyota* did not arise under administrative review law and the circuit court in that case had constitutionally granted original jurisdiction to hear and determine the claim, the Illinois Supreme Court held the

33

limitation period in the Motor Vehicle Franchise Act was not a jurisdictional prerequisite to suit. *Id.* at 341.

¶ 83    After rejecting the defendants' jurisdictional argument, the Illinois Supreme Court in *Belleville Toyota* turned to the issue of whether the limitations period in that act was an element of plaintiff's claim that the plaintiff was required to plead and prove, rather than an ordinary limitations period that provided a technical defense to the claim. *Id.* at 342. The *Belleville Toyota* court stated that its determination of the issue was "a matter of statutory construction," with the judicial role of construing statutes being to ascertain, and give effect to, legislative intent. *Id.* The Illinois Supreme Court looked to the language and the purpose of the Motor Vehicle Franchise Act and determined that the limitation period in that act was an ordinary limitation period and not an element of plaintiff's claim. *Id.* at 342-45.

¶ 84    In *Litwiller*, a tavern patron brought a claim under the Dramshop Act and mistakenly named the sole member of a limited liability company (LLC) as the defendant rather than the LLC itself. *Litwiller*, 2011 IL App (4th) 100870, ¶ 1. After the expiration of the one-year limitation period in the Dramshop Act, the circuit court granted the sole member's motion to dismiss the claim and denied the patron's motion to amend complaint to name the LLC as the defendant and for the amended complaint relate back to the filing date of the original complaint. On appeal, the plaintiff argued the one-year limitation period in the Dramshop Act did not bar the application of the relation-back doctrine. *Id.* ¶ 8. The *Litwiller* court noted that amendments to a complaint in the case of a mistaken identity of a defendant are governed by section 2-616(d) of the Code for the relation-back doctrine to apply. *Id.* ¶ 9 (citing 735 ILCS 5/2-616(d) (West 2008)). The *Litwiller* court also noted, "[t]here is no exception to the relation-back doctrine for cases brought pursuant to the Dramshop Act." *Id.* ¶ 16. The *Litwiller* court held the trial court

had erred by denying plaintiff's motion to amend the complaint to add the LLC as a defendant and have the amended pleading relate back to the date of filing of the original complaint where the plaintiff met the requirements of section 2-616(d) of the Code. *Id.* ¶ 28.

¶ 85    In this case, there is no dispute that the new plaintiffs (Fuller's family members) did not bring their loss of society claims within the Dramshop Act's one-year limitation period. Plaintiff argues that the Dramshop Act's one-year limitation period is not a condition precedent to jurisdiction. We agree that the Dramshop Act's one-year limitation period is not a condition precedent to the circuit court's jurisdiction over plaintiff's dramshop claim. See *Belleville Toyota*, 199 Ill. 2d at 340 (where a complaint alleges the existence of a justiciable matter, even if it is done defectively, the trial court possesses the jurisdiction to adjudicate that complaint, as "[s]ubject matter jurisdiction does not depend upon the legal sufficiency of the pleadings").

¶ 86    Although the one-year limitation period in the Dramshop Act is not a condition precedent to the trial court's jurisdiction, it is, nonetheless, "a condition precedent to the right of recovery which must be observed by all plaintiffs in order to bring themselves within the Act." *Demchuk*, 92 Ill. 2d at 9; but *cf. Litwiller*, 2011 IL App (4th) 100870, ¶¶ 23, 27. The primary goal of statutory construction is to ascertain and give effect to the legislature's intent, and the plain language of the statute is the best indication of that intent. *Lawler v. University of Chicago Medical Center*, 2017 IL 120745, ¶ 12. If the plain language is clear and unambiguous, the statute will be enforced as written without reading into it exceptions, conditions, or limitations not expressed by the legislature. *Id.* The interpretation of a statute is subject to a *de novo* review. *Id.*

¶ 87    As discussed above, the language of the Dramshop Act provides that each action under the Dramshop Act "shall be barred unless commenced within one year next after the cause of

35

action accrued." 235 ILCS 5/6-21(a) (West 2014). The language of the Dramshop Act also specifically addresses the scenario at issue in this case of adding a loss of society claim to an existing dramshop claim that was timely filed by a person injured by an intoxicated person, providing, "any person claiming to be injured in means of support or society and not included in any action brought hereunder may join by motion made within the times herein provided for bringing such action." *Id.* Our supreme court has stated that the intent of the limitation period in the Dramshop Act is "to prevent the evil of prolonged liability of dramshop owners who rarely have actual knowledge of the events upon which their liability is based." *Lowrey*, 20 Ill. 2d at 284 (citing *Orlicki v. McCarthy*, 4 Ill. 2d 342, 353 (1954)). We, therefore, conclude that compliance with the one-year limitation provision in the Dramshop Act is a condition precedent to the right of recovery. See 235 ILCS 5/6-21(a) (West 2014); *Demchuk*, 92 Ill. 2d at 9.

¶ 88        Here, Fuller's family members failed to file a motion to "join" the existing dramshop action of Fuller's estate "within one year next after the cause of action accrued." See 235 ILCS 5/6-21 (West 2014). Thus, according to the clear language of the statute, their loss of society claims "shall be barred." See *id.*

¶ 89        We acknowledge that the relation-back statute provides, in pertinent part:

> "(b) The cause of action *** set up in any amended pleading shall not be barred by lapse of time *under any statute* *** limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading

36

was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery or defense asserted, *if the condition precedent has in fact been performed*, and for the purpose of preserving the cause of action, cross claim or defense set up in the amended pleading, and for that purpose only, an amendment to any pleading shall be held to relate back to the date of the filing of the original pleading so amended." (Emphases added). 735 ILCS 5/2-616(b) (West 2016).

We agree with plaintiff's contention that "[t]here is no exception to the relation-back doctrine for cases brought pursuant to the Dramshop Act." *Litwiller*, 2011 IL App (4th) 100870, ¶ 16. However, in this case, plaintiff does not meet the requirements of the applicable subsection of the relation-back statute. See 735 ILCS 5/2-616(b) (West 2016).

¶ 90       As discussed above, a "condition precedent" to bringing the loss of society claims in this case was the filing a motion to join the dramshop claim of Fuller's estate within one-year after the accrual of the cause of action. See *Morales v. Fail Safe, Inc.*, 311 Ill. App. 3d 231, 236 (1999) ("[t]he one-year proviso of the Dramshop Act is not a statute of limitations; it is a condition precedent to the right of recovery which must be observed by all plaintiffs in order to bring themselves within the coverage of the Act"). Because plaintiff did not meet the condition precedent for recovery under the Dramshop Act, the relation-back doctrine cannot be applied in this case. See 735 ILCS 5/2-616(b) (West 2016). We, therefore, affirm the trial court's order denying plaintiff's motion for leave to amend the complaint.

¶ 91                              B. Summary Judgment

37

¶ 92          Plaintiff additionally argues the trial court erred by granting defendant's motion for summary judgment where there was evidence that Nolan had consumed alcohol at both Benny's Corner Bar and Woppers and had engaged in unusual behavior to support a finding that Nolan was intoxicated from alcohol at the time of the motor vehicle crash. Defendants argue the trial court's order granting summary judgment in their favor should be upheld by this court because the record contains no evidence that Nolan was intoxicated by alcohol at the time of the occurrence.

¶ 93          Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits on file show there is no genuine issue of material fact and the moving party is clearly entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 14. Our review of an order granting summary judgment is *de novo*. *Guns Save Life, Inc.*, 2021 IL 126014, ¶ 14.

¶ 94          The Dramshop Act provides, "[e]very person who is injured within this State, in person or property, by any intoxicated person has a right of action *** against any person, licensed *** to sell alcoholic liquor, who, by selling or giving alcoholic liquor *** causes the intoxication of such person." 235 ILCS 5/6-21 (West 2014). The intent of the Dramshop Act is to place the responsibility for damages occasioned by the use of alcohol on those who profit from its sale. *Kingston v. Turner*, 115 Ill. 2d 445, 457 (1987). A dramshop cause of action is "purely a creature of statute" where there is no common law remedy in Illinois for either selling or giving intoxicating liquor to a " 'strong and able-bodied man.' " *Demchuk*, 92 Ill. 2d at 5. "Hence, the liability imposed, which does not depend upon fault or negligence, and the damages recoverable are expressly and exclusively defined in the Act." *Id.*

38

¶ 95    To prove a claim under the Dramshop Act, a plaintiff must prove (1) the alleged intoxicated person was intoxicated at the time of the occurrence; (2) defendant sold or gave alcohol to the alleged intoxicated person; (3) the alcohol provided caused the intoxication of the alleged intoxicated person; (4) the intoxication, at least in part, was a proximate cause of the plaintiff's injuries; and (5) as result of the occurrence, the injured person suffered personal injuries, damage to property, loss of means of support, or loss of society. 235 ILCS 5/6-21(a) (West 2018); *Mohr v. Jilg*, 223 Ill. App. 3d 217, 221 (1992). A defendant dramshop must have "caused the intoxication" and must not have merely furnished a negligible amount of liquor. *Kingston*, 115 Ill. 2d at 457 (citing *Nelson v. Araiza*, 69 Ill. 2d 534, 540-41 (1978)). A *de minimis* contribution to a party's intoxication is not a sufficient basis for liability. *Id.* "The alcohol furnished at two [or more] separate taverns may cause a single intoxication, subject to the limitation that a tavern may not be held liable for a *de minimis* contribution to an individual's intoxication." *Mohr*, 223 Ill. App. 3d at 221-22. "The trier of facts determines whether the particular defendant did, in fact, cause the intoxication, subject of course to review as to the sufficiency of the evidence to establish the cause in fact." *Thompson v. Tranberg*, 45 Ill. App. 3d 809, 813 (1977).

¶ 96    In this case, there was evidence indicating that Nolan consumed four to five beers at Benny's Corner Bar. He arrived at that bar around 9 or 10 p.m. and left around 11:30 p.m. Taft testified that at Benny's Corner Bar she knew that Nolan had drank at least four beers because five rounds of drinks had been purchased for their group, which included Nolan, but she left before observing Nolan finish his fifth beer. There was also evidence indicating that after Nolan left Benny's Corner Bar, he went to Elmwood Tap for one or two hours. Although the exact number of beers that Nolan consumed at Elmwood Tap is not known, Nolan testified that he

39

would not have been sitting at the bar without drinking alcohol and that he mostly likely would have been drinking light beer. Thereafter, Nolan went to Woppers, where he consumed at least some portion of a beer. Arguably, contrary inferences can be drawn from the evidence regarding the amount of Nolan's alcohol consumption, but "[i]t is the function of the jury to weigh these contradictory inferences and draw an ultimate conclusion as to the facts." *Kingston*, 115 Ill. 2d at 464.

¶ 97        Here, despite the evidence of Nolan's alcohol consumption (as well as Nolan having drugs in his system evidenced by him pleading guilty to an aggravated DUI related to drugs), defendants contend there was no evidence from which the jury could find Nolan was, in fact, intoxicated by alcohol at the time of the occurrence. To prove intoxication in a Dramshop Act action, "one must show that the alleged intoxicant consumed alcohol, and must present independent evidence showing that he was, in fact, intoxicated." *Felker v. Bartelme*, 124 Ill. App. 2d 43, 48 (1970). Pursuant to the civil Illinois Pattern Jury Instructions, "[a] person is 'intoxicated' when as a result of drinking alcoholic liquor there is an impairment of his mental or physical faculties so as to diminish his ability to think and act with ordinary care." See Illinois Pattern Jury Instructions, Civil, No. 150.15 (2d ed. 1971). "IPI No 150.15 is a good definition of a term which is difficult to accurately define." *Navarro v. Lerman*, 48 Ill. App. 2d 27, 36 (1964). Evidence of intoxication must show actions or conduct that directly, or by reasonable inference, establish the individual's conduct at and before the accident was or may have been affected by the consumption of alcoholic beverages. *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554, 574-75 (1991). Whether a person is intoxicated is a question of fact for the jury to decide. *Knief v. Sotos*, 181 Ill. App. 3d 959, 964 (1989).

¶ 98        As to the amount of alcohol consumed, no specific quantity of alcohol need be consumed because the effects of alcohol vary widely among individuals. *Hagopian v. First Venture, Ltd.*, 90 Ill. App. 3d 951, 954 (1980). " 'It is well known that the effect of alcohol upon all persons is not the same but may be widely different, and that an individual who has had only a slight amount to drink may in some instances be more dangerous than a person who shows signs of intoxication.' " *Id.* (quoting *Osborn v. Leuffgen*, 381 Ill. 295, 298-99 (1942)).

¶ 99        Intoxication can be shown directly, with testimony of the intoxicated person, or circumstantially, with evidence that the alleged intoxicated person consumed alcohol and either evidence the person behaved unusually or inappropriately or opinion testimony of someone who observed indicating that the person was intoxicated. *Id.*; *Skelton*, 214 Ill. App. 3d at 575; *Lang v. B.I.T., Inc.*, 96 Ill. App. 3d 37, 39 (1981) (evidence that the alleged intoxicated person consumed alcohol, with evidence of unusual behavior or opinion evidence that the person was intoxicated, would entitle a jury to conclude the person was intoxicated). Evidence of alcohol consumption alone, unconfirmed by conduct or opinion evidence, is not sufficient to allow the jury to consider the question of intoxication. *Hagopian*, 90 Ill. App. 3d at 954. Evidence of alcohol consumption accompanied by unusual or inappropriate conduct on the part of the alleged intoxicant creates a question of fact on the issue of intoxication to be resolved by the fact finder. *Id.* at 955.

¶ 100       In *Lang*, an action was brought against two dramshops stemming from a three-car accident in which a patron of the defendant dramshops was involved. *Lang*, 96 Ill. App. 3d at 38. The evidence indicated the patron drank three or four glasses of beer and shared in three or four pitchers of beer with five or six others at one establishment and drank one bottle of beer at another establishment in the hours leading up to the accident. *Id.* On appeal from a directed verdict in favor of the defendants, this court acknowledged the unrefuted evidence of alcohol

41

consumption but found missing any opinion evidence that the patron was intoxicated or any proof of unusual or erratic behavior to support a finding of intoxication. *Id.* at 39. The *Lang* court, therefore, affirmed the trial court where the record failed to establish the patron was intoxicated at time of the collision (and also failed to established that tortious act of patron had caused the injuries where there was no evidence that his vehicle had caused the three-vehicle collision). *Id.* 39-40.

¶ 101        In *Hagopian*, the First District Appellate Court reversed the trial court's refusal to give a jury instruction on the issue of intoxication in a personal injury case. *Hagopian*, 90 Ill. App. 3d at 954-55. The *Hagopian* court noted that the testimony presented indicated the alleged intoxicated person (the plaintiff) had four drinks within four hours; his sister-in-law believed him to be "high" and "feeling good" but not to be intoxicated; he argued with a woman outside the club and tried to force his way back in; and he was kicking, screaming obscenities, threatening a passerby, and causing a scene while being ejected. *Id.* The appellate court held those circumstances would support a jury finding that plaintiff was intoxicated and, therefore, the jury should have been instructed on the issue of intoxication. *Id.* at 955. "[C]ontrary inferences could have been drawn from the same set of facts, so that the jury should not, as a matter of law, have been foreclosed from that determination." *Id.*

¶ 102        In *Weeks v. Witek*, 33 Ill. App. 3d 916, 917-19 (1975), this court held the trial court erred in directing a verdict in favor of defendants in a dramshop action where the evidence showed the alleged intoxicated person consumed two bottles of beer at one establishment and four or five beers at another establishment; threw a bottle 15 feet across the bar at the plaintiff (without any provocation from plaintiff), striking plaintiff in the forehead and knocking him off his barstool; kicked and punched plaintiff even though plaintiff was on the floor and bleeding profusely from

42

the cut on his forehead; had to be pulled away from plaintiff; and ran out when the bartender called police. This court noted that while evidence only showing the consumption of alcoholic beverages was insufficient to show intoxication, evidence of consumption, together with evidence of "unusual behavior or opinion evidence that he was drunk, would entitle a jury, under such circumstances, to conclude the person was intoxicated." *Id.* at 918 (citing *Felker*, 124 Ill. App. 2d 43). Although no witness, including plaintiff, had opined that the aggressor was intoxicated, this court held that the aggressor's acts and conduct constituted unusual behavior warranting the inference that the aggressor was intoxicated. *Id.* This court stated, "[t]his does not mean a jury would be required to find [he] was intoxicated any more than it would be required to do so where there was opinion evidence of intoxication." *Id.*

¶ 103  In *Weiner v. Trasatti*, 19 Ill. App. 3d 240, 242-43, 247 (1974), the First District Appellate Court reversed the circuit court's directed verdict in favor of the defendant dramshop where defendant's patron drank two 12-ounce bottles of beer in defendant's establishment over the course of 1 hour and 30 minutes; left the defendant's establishment and drove for 15 minutes; began to feel tired; fell asleep; had no recollection of what occurred for the next mile; and struck the rear of a properly parked vehicle, striking and killing the wife and mother of the plaintiffs. Both the patron and his passenger opined the patron was sober and there had been nothing unusual about his behavior or the way he was driving before the patron fell asleep. *Id.* at 243. The *Weiner* court concluded that a jury could have found that the patron was intoxicated at the time of the occurrence and that it was for the jury to determine whether at the time of occurrence, the patron was intoxicated and his intoxication was caused by the alcoholic beverage he drank in defendant's establishment. *Id.* at 245.

¶ 104    In this case, there was evidence of Nolan's alcohol consumption. Absent from the record is any opinion evidence from witnesses indicating that Nolan appeared to be intoxicated. In fact, witnesses at Benny's Corner Bar, the bartender at Woppers, and witnesses who were in contact with Nolan after the accident indicated that Nolan did not appear to be drunk. Nonetheless, there was ample evidence indicative of Nolan's unusual or erratic behavior where the evidence indicated the following: Nolan went to Benny's Corner Bar in Farmington to meet Fuller, left Fuller at that bar to go home because Fuller was too drunk to hang out with, and then moments later met up with Fuller at a second bar (Elmwood Tap) in another town (Elmwood) and stayed at that bar with Fuller for one or two hours, where Nolan would have been drinking; Nolan then went to the bar next door (Woppers) and almost immediately became involved in a verbal altercation with a drunk patron and, after that matter settled, Nolan became involved in a second verbal altercation with the same drunk patron; Nolan left Woppers, squealing the tires of his pickup truck as he drove off; Nolan drove 5 to 10 miles per hour over the speed limit at the time of the occurrence; Nolan lost control of his vehicle and flipped his vehicle over, with Fuller being ejected from the vehicle; Nolan failed to recognize, or had a complete disregard for, the severity of Fuller's injuries and/or death; Nolan did not call 9-1-1 or obtain medical attention for Fuller's injuries; Nolan called Kosner to tow away his vehicle rather than calling police in regard to his vehicle's damage; Nolan called Milliman to drive him and Fuller to Wilson and Zamaro's home rather than taking Fuller to a hospital or seeking medical attention for Fuller; Nolan hung up on Milliman at Milliman's suggestion to call 9-1-1; Nolan indicated that Fuller was "fine" despite Fuller's extensive injuries and/or death; and Nolan minimized the severity of the motor vehicle crash and Fuller's condition to prevent others from seeking medical attention for Fuller at the accident scene and upon arriving at Wilson and Zamaro's house.

¶ 105    Thus, there was evidence of Nolan's alcohol consumption and evidence of his usual behavior after he consumed the alcohol. Although there was evidence that Nolan did not appear intoxicated, it is for the trier of fact to assess a witness's credibility, weigh the testimony, and draw reasonable inferences from the evidence. *People v. Hutichinson*, 2013 IL App (1st) 102332, ¶ 27; *People v. Oritz*, 196 Ill. 2d 236, 259 (2001). In this case, a genuine issue of material fact exists as to whether Nolan was intoxicated at the time of the motor vehicle crash. Consequently, the trial court erred in entering summary judgment in favor of defendants.

¶ 106    We, therefore, reverse the trial court's order granting defendants' motion for summary judgment as to defendants Benny's Corner Bar and Woppers and remand for further proceedings as to those defendants. We make no determination as to Woppers' individual argument in defendants' motion for summary judgment regarding its lack of liability as a matter of law based on a *de minimis* amount of alcohol having been consumed by Nolan at its establishment, which should be addressed on remand. We affirm the grant of summary judgment in favor of defendant Trojan's Corner where plaintiff, in the circuit court, conceded a lack of evidence that Nolan had visited Trojan's Corner on the night of the occurrence and that summary judgment in favor of Trojan's Corner was proper and plaintiff has made no argument in relation to Trojan's Corner on appeal.

¶ 107                                    III. CONCLUSION

¶ 108    The judgment of the circuit court of Peoria County is affirmed in part and reversed in part, and this matter is remanded for further proceedings.

¶ 109    Affirmed in part and reversed in part; cause remanded.

2022 IL App (3d) 180670

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 16-L-72; the Hon. Michael P. McCuskey, Judge, presiding. |
| **Attorneys for Appellant:** | James P. LeFante and Shane M. Mahoney, of LeFante Law Offices, P.C., of Peoria, for appellant. |
| **Attorneys for Appellee:** | Greg Gaz, of Springfield, for appellees. |